**UNITED STATE DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

<table>
<tr><td>
Erol Türedi, Yusuf Karakoç, Mustafa Akkin,<br>
Can Akkin, Mustafa Akkin,  Ahmet Çakmak,<br>
Fahrettin Takici, Resul Güçlü, Ali Gülen,<br>
Çiğdem Gülen, Ali Gülen,  Hamdi Çulha,<br>
Fatih Dilbaz, Zeynep Sibel Dilbaz, Osman Kör,<br>
Ali Tezcan, Turgût Gezer, Fahrettin Pompa,<br>
Sevcan Pompa, Yeşim Pompa, Ebru Pompa,<br>
Fahrettin Pompa, Erol Balci, Havva Balci,<br>
Av. Ayhan Eerkan, and Ali Riza Küçúkosmanoglu,<br><br>
             Plaintiffs,<br><br>
        v.<br><br>
The Coca - Cola Company, Coca -Cola Export<br>
Corporation, Coca - Cola Içecek, A.S., and<br>
Corporate DOES 1 - 10<br><br>
             Defendants.
</td>
<td>
)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)
</td>
<td>
05 CV 9635 (VM)<br><br>
**ELECTRONICALLY FILED**
</td>
</tr>
</table>

**PLAINTIFFS JOINT MEMORANDUM OF POINTS AND AUTHORITIES IN**

**OPPOSITION TO ALL DEFENDANTS' MOTIONS TO DISMISS**

## TABLE OF CONTENTS

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ................................................1

II.   STATEMENT OF FACTS ...................................................................................3

III.  ARGUMENT ........................................................................................................8

      A.   Plaintiffs' Numerous Claims Based on Coca-Cola's Conduct in the U.S.
           Must be Heard in This Court, and Defendants Do Not Argue Otherwise .............8

           1.   Plaintiffs State a Well-Pleaded RICO Claim Based on a
                Conspiracy Conducted by Coca-Cola from the United States ...................9

                a. Plaintiffs allege a continuous pattern of racketeering predicate
                   acts under RICO ...................................................................................9

                b. Plaintiffs' allegations also establish extraterritorial subject
                   matter jurisdiction under RICO ...........................................................10

                c. Plaintiffs allege injuries to property ....................................................12

           2.   Plaintiffs Also State Several Well-Pleaded Claims under
                New York Law That  Focus Primarily on Coca-Cola's
                U.S. Conduct .......................................................................................13

                a.  Negligence .........................................................................................13

                b.  Deceptive Practices ............................................................................14

                c.  Fraudulent misrepresentation and injurious falsehood ........................16

                d.  Unjust enrichment ..............................................................................17

      B.   That Plaintiffs Have Substantial Claims Based on U.S. Conduct, Which
           Must be Heard in the U.S., Prevents Transfer of Any Part of their Case .............19

      C.   Turkey is Not an Adequate, Alternative Forum Even for Plaintiffs' ATS /
           TVPA Claims, Which Are Backed by a Strong U.S. Policy Favoring the U.S.
           Forum ........................................................................................................22

      D.   Plaintiffs' Choice of Forum Even as Citizens and Residents of Turkey
           is Still Entitled to Deference ...........................................................................25

E.    Defendants Have Not Met Their Burden of Showing that Turkey is an Adequate Forum ............................................................................27

F.    Plaintiffs Should Be Afforded An Opportunity to Depose Defendants' Foreign Law Expert ........................................................................32

G.    The Balance of Factors Weighs in Favor of Litigation in the U.S. ........................34

      1.    Public Interest Factors ..............................................................34

      2.    Private Interest Factors ............................................................35

H.    There Is No International Comity Issue in This Case ..........................................38

I.    Plaintiffs Have Alleged Actionable Claims Under the ATS and TVPA For Torture .................................................................................40

      1.    The Brutality Experienced By Plaintiffs Is Torture ...................................41

      2.    The torture inflicted on Plaintiffs was not incidental to "lawful sanctions" and in any event this turns on a question of fact .....................43

      3.    Corporations Can Be Sued As "Individuals" Under the TVPA ................44

      4.    Plaintiffs Have Exhausted Available Remedies in Turkey .......................48

      5.    Aiding and Abetting Is Available in Both ATS and TVPA Claims .........50

J.    Plaintiffs Have Alleged an Actionable Claim for CIDTP Under the ATS ...........54

IV.    CONCLUSION .................................................................................55

## TABLE OF AUTHORITIES

### CASES

*3105 Grand Corp. v. City of N.Y.,*
    288 N.Y. 178 (1942) ........................................................................18

*Abebe-Jira v. Negewo,*
    72 F.3d 844 (11th Cir. 1996) ....................................................41, 54

*Abiola v. Abubakar,*
    267 F. Supp. 2d 907 (N.D. Ill. 2003) ...........................................24

*Adamu v. Pfizer, Inc.,*
    399 F. Supp. 2d 495, 505 n.6 (S.D.N.Y. 2005) .........................26, 35

*Aguinda v. Texaco,*
    945 F. Supp. 625 (S.D.N.Y. 2001) .................................................26

*Aldana v. Del Monte Fresh Produce, Inc.,*
    416 F.3d 1242 (11th Cir. 2005) ..........................................41, 42, 50

*ALPA S.A. Agroindustrial Alemano v. ACLI Int'l,*
    573 F. Supp. 1070 (S.D.N.Y. 1983) .............................................20

*Arndt v. UBS AG,*
    342 F. Supp. 2d 132, (E.D.N.Y. 2004) ........................................46

*Base Metal Trading S.A. v. Russian Aluminum,*
    2002 WL 987257 (S.D.N.Y. May 14, 2002) ...................................32

*Beanal v. Freeport-McMoran, Inc.,*
    197 F.3d 161 (5th Cir. 1999) .........................................................46

*Beanal v. Freeport-McMoRan, Inc.,*
    969 F. Supp. 362 (E.D. La. 1997) ................................................46

*Bellere v. Gerics,*
    759 N.Y.S.2d 105 (2d Dep't 2003) ..............................................13

*Bigio v. Coca-Cola,*
    2006 WL 1236789, at *2 (2d Cir. May 9, 2006) .................25, *passim*

*Bigio v. Coca-Cola,*
 2005 WL 287397 (S.D.N.Y. Feb. 3, 2005) ...................................................... 35

*Blue Cross of Cent. N.Y. v. Wheeler,*
 461 N.Y.S.2d 624 (4th Dep't 1983) ................................................................18

*Bodner v. Banque Paribas,*
 114 F. Supp. 2d 117 (E.D.N.Y. 2000) ................................................ 36, 39, 50

*Bowoto v. Chevron Texaco Corp.,*
 312 F. Supp. 2d 1229 (N.D. Cal. 2004)............................................................50

*Branch v. Smith,*
 538 U.S. 254 (2003) .........................................................................................41

*Briarpatch Ltd. v. Phoneix Pictures Inc.,*
 373 F.3d 296 (2d Cir. 2004) .............................................................................19

*Bridgeway Corp. v. Citibank,*
 201 F.3d 134 (2d Cir. 2000) .............................................................................28

*Burke v. Dowling,*
 944 F. Supp. 1036 (E.D.N.Y. 1995) .................................................................54

*Burnett v. Al Baraka Investment,*
 274 F. Supp. 2d 86 (D.D.C. 2003) ...................................................................50

*Cabello v. Fernandez-Larios,*
 402 F.3d 1148 (11th Cir. 2005) ............................................................50, 53, 54

*Cabiri v. Assasie-Gyimah,*
 921 F. Supp. 1189, 1197, n. 6  (S.D.N.Y. 1996) ........................................35, 49

*Clark-Fitzpatrick Inc. v. Long Island R.R. Co.,*
 70 N.Y.2d 382 (N.Y. 1987) .............................................................................18

*Clinton v. New York,*
 524 U.S. 417 (1998) ...................................................................................45, 48

*Corrie v. Caterpillar Inc.,*
 403 F. Supp. 2d 1019 (W.D. Wash. 2005) .......................................................50

*Country World v. Imperial Frozen Foods Co.,*
    589 N.Y.S.2d (N.Y. App. Div. 2d Dep't 1992) ...............................................................17

*Crimson Semiconductor, Inc. V. Electrnum,*
    629 F. Supp. 903 (S.D.N.Y. 1986) ...................................................................................19

*Design Strategies, Inc. v. Davis,*
    384 F. Supp.2d 649 (S.D.N.Y. 2005) ..............................................................................18

*Diaz v. Gates,*
    420 F.3d 897 (9th Cir. 2005) ...................................................................................12, 13

*Diehl & Sons, Inc. v. Int'l Harvester Co.,*
    445 F. Supp. 282 (E.D.N.Y. 1978) ..................................................................................17

*Doe v. Exxon Mobil Corp.,*
    2006 WL 516744, at *3-4 (D.D.C. Mar. 2, 2006) ...............................................13, 22, 35

*Doe v. Exxon Mobil Corp.,*
    393 F. Supp. 2d 20 (D.D.C. 2005) .............................................................................47, 50

*Doe v. Islamic Salvation Front,*
    993 F. Supp. 3 (D.D.C. 1998) ..........................................................................................41

*Doe v. Povich,*
    768 N.Y.S.2d 571 (Sup. Ct. 2003) ...................................................................................13

*Doe v. Qi,*
    349 F. Supp.2d 1258 (N.D. Cal. 2004) ......................................................................43, 50

*Doe v. Rafael Saravia,*
    348 F. Supp. 2d 1112 (E.D. Cal. 2004) .....................................................................50, 53

*Doe I v. Unocal Corp.*
    395 F.3d 932 (9th Cir. 2002) ...........................................................................................50

*Drexel Burnham Lambert Group, Inc. v. Galadari,*
    777 F.2d 877 (2d Cir. 1985) ............................................................................................38

*Eastman Kodak Co. v. Kavlin,*
    978 F. Supp. 1078 (S.D. Fla. 1997) ................................................................................43

*Estate of Cabello v. Fernandez-Larios,*
    402 F.3d 1148 (11th Cir. 2005) ...........................................................................50

*Estate of Rodriquez v. Drummond Co., Inc.,*
    256 F. Supp. 2d 1250, 1255 n. 2 (N.D. Ala. 2003) ................................38, 46, 49

*EUA Cogenex Corp. v. N. Rockland Cent. Sch. Dist.,*
    124 F. Supp. 2d 861, (S.D.N.Y. 2000) ............................................................19

*Faison v. Nationwide Mortgage Corp.,*
    839 F.2d 680 (D.C. Cir. 1988) .......................................................................14

*Filartiga v. Pena-Irala,*
    630 F.2d 876 (2d Cir. 1980) .................................................................30, 40, 50

*Firma Melodiya v. ZYX Music GmbH,*
    882 F. Supp. 1306 (S.D.N.Y.1995) .................................................................21

*Flores v. So. Peru Copper Corp.,*
    253 F. Supp. 2d 510 (S.D.N.Y. 2002) .............................................................26

*Globalnet Financial Com, Inc. v. Frank Crystal & Co., Inc.,*
    2006 WL 1195923, *6 (2d. Cir. May 5, 2006) ................................................38

*Golden Pac. Bancorp v. FDIC,*
    375 F.3d 196, 203 n.8 (2d Cir. 2004) ..............................................................17

*Goshen v. Mutual Life Ins. Co.,*
    98 N.Y.2d 314 (N.Y. 2002) .....................................................................14, 16

*Gulf Oil Corp. v. Gilbert,*
    330 U.S. 501 (1947) ......................................................................................35

*Halberstam v. Welch,*
    705 F.2d 472 (D.C. Cir. 1983) .......................................................................52

*Harmony v. United States (The Malek Adhel),*
    43 U.S. (2 How.) 210, (1844)..........................................................................51

*Hartford Fire Ins. Co. v. California,*
    509 U.S. 764 (1993) ......................................................................................39

*Hayden v. Pataki*,
  2006 U.S. App. LEXIS 11187 (2nd Cir. 2006) ....................................................53

*Hilao v. Estate of Marcos*,
  103 F.3d 767 (9th Cir. 1996) ..............................................................41, *passim*

*Hochman v. LaRea*,
  789 N.Y.S.2d 300 (2d Dep't 2005) ....................................................................19

*In re Agent Orange Product Liability Litig.*,
  373 F. Supp. 2d 7 (E.D.N.Y. 2005) ..............................................................46, 50

*In re Bridgestone/Firestone*,
  131 F. Supp.2d 1027 (S.D. Ind. 2001) ................................................................32

*In re Bridgestone/Firestone, Inc.*,
  190 F. Supp. 2d 1125 (S.D. Ind. 2002)..........................................................31, 36

*In re Cinar Corp. Secs. Litig.*,
  186 F. Supp. 2d 279  (E.D.N.Y. 2002) .........................................................39, 40

*In re Disater at Riyadh Airport*,
  540 F. Supp. 1141 (D.D.C. 1982) .......................................................................20

*In re Estate of Marcos Human Rights Litigation*,
  25 F.3d 1467 (9th Cir. 1994) ..............................................................................40

*In re Maxwell Comm. Corp.*,
  93 F.3d 1049 (2d Cir. 1996) ...............................................................................39

*In re MTBE Prods. Liab. Litig.*,
  175 F. Supp. 2d 593 (S.D.N.Y. 2001) ..........................................................15, 16

*In re South Africa Apartheid Litigation*,
  346 F. Supp. 2d 538 (S.D.N.Y. 2004) ................................................................50

*In re Sprint Corp. Secs. Litig.*,
  232 F. Supp. 2d 1193 (D. Kan. 2002) .................................................................33

*In re Terrorist Attacks on Sept. 11, 2001*,
  349 F.  Supp.  2d 765 (S.D.N.Y. 2005) .........................................................46, 50

*In re Yamashita,*
    327 U.S. 1 (1946) ................................................................................................52

*Iragorri v. United Techs. Corp.,*
    274 F.3d 65 (2d Cir. 2001) .................................................................25, *passim*

*Jacobs v. Felix Bloch Erben,*
    160 F. Supp.2d 722 (S.D.N.Y. 2001) ...................................................................33

*Jablonski v. Rapalje,*
    788 N.Y.S.2d 158 (N.Y. App. Div. 2d Dep't 2005) ...........................................17

*Jose Armando Bermudez & Co. v. Bermudez Intern,*
    2000 WL 1225792, *5 (S.D.N.Y. 2000) ..............................................................21

*Kadic v. Karadzic,*
    70 F.3d 232 (2d Cir. 1995) .....................................................................41, 43, 51

*Karlin v. IVF America,*
    93 N.Y.2d 282 (N.Y. 1999) ..................................................................................15

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.,*
    191 F.3d 229 (2nd Cir. 1999) ...............................................................................12

*Lake Minnewaska Mtn. Houses, Inc. v. Rekis,*
    686 N.Y.S.2d 186 (3d Dep't 1999) ................................................................18, 19

*Lama Holding Co. v. Smith Barney, Inc.,*
    88 N.Y.2d 413 (N.Y. 1996) ..................................................................................17

*Lehman v. Cayman, Ltd.,*
    713 F.2d 339 (8th Cir. 1983) ................................................................................36

*Lony v. E.I. DuPont de Nemouirs & Co.,*
    886 F.2d 628 (3d Cir. 1989) .................................................................................26

*Manu Int'l S.A. v. Avon Prods., Inc.,*
    641 F.2d 62 (2d Cir. 1981) .............................................................................36, 38

*Maristany v. Patient Support Servs., Inc.,*
    693 N.Y.S.2d 143 (1st Dep't 1999) ......................................................................13

*Mathias v. Jacobs*,
238 F. Supp. 2d 556 (S.D.N.Y. 2001) ...............................................................18

*Meachum v. Outdoor World Corp.*,
652 N.Y.S.2d 749 (2d Dep't 1997) ...................................................................14

*Mehinovic v. Vuckovic*,
198 F. Supp. 2d 1322 (N.D.Ga. 2002) ...................................................50, 53, 54

*Mendoza v. Zirkle Fruit*,
301 F.3d 1163 (9th Cir. 2002) ....................................................................12, 13

*Metropolitan Life Ins. Co. v. Ward*,
470 U.S. 869 (1985) .........................................................................................45

*Minibooster Hydraulics v. Scanwill Fluid Powers*,
315 F. Supp.2d 286 (S.D.N.Y. 2004) ...............................................................21

*Modern Computer Corp. V. His K. Ma*,
862 F. Supp. 938 (E.D.N.Y. 1994) ...................................................................21

*Monroe v. Pape*,
365 U.S. 167 (1961) .........................................................................................43

*Mujica v. Occidental Petro. Corp.*,
381 F. Supp. 2d 1134 (C.D. Cal. 2005) ....................................................34, 36, 39

*Mujica v. Occidental Petro. Corp.*,
381 F. Supp.2d 1164 (C.D. Cal. 2005).......................................................46, 53

*Nat'l Group for Communs. & Computers Ltd. v. Lucent Techs., Inc.*,
420 F. Supp. 2d 253 (S.D.N.Y. 2006) ...............................................................11

*Norex Petroleum Ltd. v. Access Industries, Inc.*,
2003 WL 1484269 (S.D.N.Y. 2003) .................................................................32

*North South Fin. Corp. v. Al Turki*,
100 F.3d 1046 (2d Cir. 1996) ....................................................................10, 11

*Onanuga v. Pfizer*,
369 F. Supp. 2d 491 (S.D.N.Y. 2005) ...............................................................19

*Parex Bank v. Russian Savings Bank,*
    116 F. Supp. 2d 415 (S.D.N.Y. 2000) .............................................................34

*Pelman v. McDonald's Corp.,*
    396 F.3d 508 (2d Cir. 2005) ..........................................................................15

*Penn-Ohio Steel Corp. v. Allis-Chalmers Manuf. Co.,*
    184 N.Y.S.2d 58 (N.Y. App. Div. 1st Dep't 1959) ........................................17

*Peterson v. Manitowok Co.,*
    25 N.Y.2d 412 (1969) ....................................................................................14

*Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.,*
    78 F.R.D. 445 (Del.1978) ..............................................................................22

*Piper Aircraft Co. v. Reyno,*
    454 U.S. 235, 255 n.22 (1981) ..................................................................22, 24

*Posada v. Nat'l City Bank of New York,*
    296 U.S. 497 (1932) ......................................................................................41

*Presbyterian Church of Sudan v. Talisman Energy, Inc.,*
    244 F. Supp. 2d 289 (S.D.N.Y. 2003) ..............................................24, *passim*

*Presbyterian Church of Sudan v. Talisman Energy, Inc.,*
    374 F. Supp. 2d 331 (S.D.N.Y. 2005) ...........................................................50

*Price v. Socialist People's Libyan Arab Jamahiriya,*
    274 F. Supp. 2d 20 (D.C. Cir. 2003) .............................................................44

*R. Maganlal & Co. v. M.G. Chem. Co., Inc.,*
    942 F.2d 164 (2d Cir. 1991) ..........................................................................38

*Ravelo Monegro v. Rosa,*
    211 F.3d 509 (9th Cir. 2000) .........................................................................26

*Rudetsky v. Dowd,*
    660 F. Supp. 341 (E.D.N.Y. 1987) ..........................................................37, 38

*Securitron Magnalock Corp. v. Schnabolk,*
    65 F.3d 256 (2d Cir. 1995) ............................................................................15

*Silberman v. Innovation Luggage, Inc.*,
    2002 WL 31175226 *2 (S.D.N.Y. 2002) ........................................32

*SINALTRAINAL v. The Coca-Cola Co.*,
    256 F. Supp.2d 1345 (S.D. Fla. 2003) ........................................46, 49

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004) ........................................40, 51, 54

*State of Ohio v. Bell Telephone Co.*,
    36 Ohio St. 296 (1880) ........................................45

*Stutman v. Chem. Bank*,
    95 N.Y.2d 24 (N.Y. 2000) ........................................14, 15

*Tachiona v. Mugabe*,
    234 F. Supp. 2d 401 (S.D.N.Y. 2002) ........................................24, *passim*

*Tachiona v. United States*,
    386 F.3d 205 (2d Cir. 2004) ........................................24

*Talbot v. Janson*,
    3 U.S. (3 Dall.) 133 (1795) ........................................51

*The Amiable Nancy*,
    16 U.S. (3 Wheat.) 546 (1818) ........................................51

*The State of Ohio v. Bell Telephone Co.*,
    36 Ohio St. 296 (1880) ........................................45

*U.S. v. Aimone*,
    715 F.2d 822 (3d Cir. 1983) ........................................46

*U.S. v. Blinder*,
    10 F.3d 1468 (9th Cir. 1993) ........................................45

*U.S. v. Cooper*,
    91 F. Supp.2d 60 (D.D.C. 2000) ........................................46

*U.S. v. Feldman*,
    853 F.2d 648 (9th Cir. 1988) *cert. denied*, 489 U.S. 1030 (1989) ........................................45

*U.S. v. Middleton*,
231 F.3d 1207 (9th Cir. 2000) ............................................................45

*U.S. v. Thevis*,
665 F.2d 616 (5th Cir. 1982) ............................................................46

*U.S. v. Turkette*,
452 U.S. 576 (1981) ............................................................46

*U.S. East Telecomms., Inc. v. US West Comms. Servs., Inc.*,
38 F.3d 1289 (2d Cir. 1994) ............................................................18

*Velez v. Levy*,
401 F.3d 75 (2d Cir. 2005) ............................................................43

*Vasquez v. Bridgestone/Firestone, Inc.*,
325 F.3d 665 (5th Cir. 2003) ............................................................20

*Verizon Directories Corp. v. Yellow Book USA, Inc.*,
338 F. Supp. 2d 422 (E.D.N.Y. 2004) ............................................................15

*Vitolo v. Dow Corning Corp.*,
634 N.Y.S.2d 362 (N.Y. Sup. Ct. 1995) ............................................................14

*Williams v. Dow Chem. Co.*,
255 F. Supp. 2d 219 (S.D.N.Y. 2003) ............................................................12

*Wiwa v. Royal Dutch Petroleum Co.*
226 F.3d 88 (2d Cir. 2000) ............................................................24, 34, 36-37

*Wiwa v. Royal Dutch Petroleum Co.*,
2002 WL 319887, at *20-22 (S.D.N.Y. Feb. 28, 2002) ............................................................12, 49, 53

*Yoder v. Orthomolecular Nutrition Inst., Inc.*,
751 F.2d 555 (2d Cir. 1985) ............................................................ 9

## STATUTES

18 U.S.C.
Section 1961(1)(A)-B ............................................................10
Section 1961(5) ............................................................10
Section 1964(c) ............................................................12

28 U.S.C.
    Section 1350 ................................................................................2, *passim*

42 U.S.C.
    Section 1983 ................................................................................43

New York General Business Law ("NY GBL")
    Section 349 ................................................................................14, 15, 16
    Section 349 (a), (h) ................................................................................14

542 U.S. ................................................................................51, 54

## RULES

8 C.F.R.
    Section 208.18 (3) ................................................................................43

## OTHER AUTHORITIES

Amnesty International's Report, entitled *Turkey: No Impunity for State
Officials Who Violate Human Rights* (May 2006) ................................................................................29

Balanding, *The Case Against Coca-Cola*, THE NATION, May 1, 2006 ......................................1, 15

Black's Law Dictionary, 4th & 6th Editions ................................................................................45

Boyd, *The Inconvenience of Victims: Abolishing Forum Non Conveniens in U.S.
Human Rights Litigation*, 39 *Va. J. Int'l L.* 41 (1998) ......................................23

*Breach of Neutrality*, 1 Op. Att'y Gen. 57 (1795) ................................................................................50-51

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or
Punishment, *adopted* Dec. 10, 1984, *entered into force* June 26, 1987 G.A.
Res. 39/46, 39 U.N. GAOR, No. 51, at 197, U.N. Doc. A/39/51 (1984) Arts.
1, 4, SPA314 ................................................................................51

Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances,
*adopted* Dec. 19, 1988, 28 I.L.M. 493 (1989) ................................................................................52

Convention for the Suppression of Terrorist Bombings, *adopted* Jan. 9, 1998, G.A.
Res. 52/164 ................................................................................52

European Commission, *2003 Regular Report on Turkey's Progress Toward Accession* ............29

Moldovan, *New York Creates a Private Right of Action to
    Combat Consumer Fraud: Caveat Venditor*, 48 Brook. L. Rev. 509 (1982) ...................15

Human Rights Watch, *Turkey: Police Killings Follow Attack on Bookstore* (Nov. 18, 2005) ....29

*In re Tesch*,
    13 Int'l. L. Rep. 250 (Br. Mil. Ct. 1946) .........................................................................51

International Convention for the Suppression of the Financing of Terrorism, *adopted*
    Dec. 9, 1999, G.A. Res. 54/109 .......................................................................................52

Restatement of Restitution
    Section 1 ..........................................................................................................................18

Restatement (Third) of Foreign Relations Law
    Section 702 .......................................................................................................................54

Restatement of Torts
    Section 876(b) ..................................................................................................................52

Senate Report 102-249 ...............................................................................................................23, 47

S. Rep. No.102-249, 1991 WL 258662 ....................................................................................48, 53

U.S. Department of State Country Report on Human Rights Practices, Turkey (2005) ...............28

*United States v. Friedrich Flick*, 6 Trials of War Criminals Before the
    Nuremberg Military Tribunals Under Control Council Law No. 10, (1952) ....................51

*United States v. Krauch*, 8 Trials of War Criminals Before the Nuremberg
    Military Tribunals Under Control Council Law No. 10 (1952) ........................................51

Ved P. Nanda & David K. Pansius, *Int'l Law Torts*, 2 *Litigation of Int'l
    Disputes in U.S. Courts* § 14:9 (2004) ............................................................................23

Webster's New World Dictionary 1334 (3d ed. 1988) ................................................................53

4th Edition of Black's Law Dictionary .....................................................................................45

6th Edition of Black's Law Dictionary......................................................................................45

137 Cong. Rec. S1369-01, 1991 WL 9635 ................................................. ....................47

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

The Coca-Cola Defendants'[1] argument that Plaintiffs' claims are a mere Turkish labor

dispute, which should be resolved in Turkey, might be persuasive if it were true.  However, in

their enthusiasm to bolster their *forum non conveniens* ("*FNC*") argument, Defendants neglect to

mention that most of Plaintiffs' claims relate to Defendant Coca-Cola's conduct that occurred in

the United States, including New York.  Most of Plaintiffs' claims are premised on Coca-Cola's

massive corporate coverup designed to prevent American consumers from deserting the Coca-

Cola brand due to the company's brutal anti-union activities across the globe, including the

systematic intimidation and torture of Plaintiffs in Turkey.  The coverup was reported by *The*

*Nation* magazine, among others, to be a massive campaign by Coca-Cola to quell demands by

university students in the U.S., including at New York University, that their schools cancel their

Coca-Cola supply contracts until the company changes its anti-union global labor practices.[2]  The

incident in Turkey is but one example of the violence around the world at Coca-Cola's bottling

plants, which continues largely because Coca-Cola has vast media resources dedicated to

deceiving the public about its role in the union violence.

Plaintiffs' injuries result from the anti-union culture at Coca-Cola, which is projected

globally through Coca-Cola's control over its foreign bottlers, including in Turkey, but which

---

[1] Plaintiffs bring their human rights action against Defendants The Coca-Cola Company
("Coca-Cola"), Coca-Cola Export Corporation ("Coca-Cola Export"), and Coca-Cola Içecek
("CCI").  All of the Coca-Cola entities are collectively referred to herein as the "Coca-Cola
Defendants" or "Defendants."  The Defendants filed two lengthy briefs to support their motions
to dismiss.  Coca-Cola and Coca-Cola Export jointly filed a 47-page brief ("Coca-Cola Br."), and
CCI filed a 35-page brief ("CCI Br."), for a total of 82 pages.  Much of the briefing is repetitive,
and in the interests of judicial economy, Plaintiffs hereby submit their joint opposition, which
addresses all issues raised in both briefs submitted by Defendants.

[2] Michael Balanding, *The Case Against Coca-Cola*, THE NATION, May 1, 2006, attached
hereto as Exhibit A.

Coca-Cola conceals from U.S. consumers and shareholders through its marketing prowess. There is no question that Plaintiffs' specific legal claims for RICO violations, negligence, fraudulent misrepresentation, injurious falsehood, unjust enrichment, and deceptive consumer practices, which are based exclusively on Coca-Cola's conduct in the U.S., are actionable in this Court. The U.S., and New York in particular, has a substantial public interest in adjudicating the conduct of one of its multinational super-corporations. This interest is made even stronger by Plaintiffs' claims for torture under the Alien Tort Statute ("ATS") and the Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350, *note*, for the extreme violence inflicted on Plaintiffs by Defendants through the Çevik Kuvvet, a brutal "special branch" of the Turkish police. While these violent acts occurred in Turkey, Coca-Cola executives in the U.S. set the stage for the violence with policy decisions made in the United States, and implemented through Coca-Cola's control over its foreign bottlers. Following the violence, Coca-Cola acted to mislead the U.S. public about the events in Turkey, as previously indicated.

At its core, this is a case of a U.S. corporation using its global reach to reap enormous profits by actively sanctioning, as a matter of corporate policy, the torture of trade unionists at its foreign bottling plants, then misleading American consumers and shareholders to protect those profits. In short, it is a case that is inappropriate for FNC dismissal. The law is clear in this Circuit that if some of Plaintiffs' claims are based on U.S. conduct and must be heard here, then the entire case must be heard here and FNC dismissal is inappropriate. Further, Defendants have failed to meet their burden of showing that Turkey is an adequate, alternative forum for any of Plaintiffs' claims, a prerequisite to considering the FNC issue, and they likewise have failed to

2

meet their burden of showing that the balancing of public and private factors strongly favors FNC dismissal.

Defendants' remaining arguments regarding the adequacy of Plaintiffs' ATS and TVPA claims also fail. Claims for torture are now not only routine under the ATS, but are authorized specifically by the TVPA. Defendants therefore cannot dispute that torture is an actionable international norm, but instead question whether Plaintiffs' particular allegations are sufficient to constitute torture. There may well have been a time when the term "torture" conjured up images of dungeons and thumbscrews but, as discussed below, the law has moved well beyond that. Further, corporations can be held liable under the TVPA. Plaintiffs need not have exhausted remedies in Turkey because they had none, and that forum is unavailable to them in prosecuting international human rights torts. Finally, Defendants can be held liable for aiding and abetting Plaintiffs' injuries.

## II.  STATEMENT OF FACTS

Plaintiffs are trade union members, formerly employed as transport workers to deliver Coca-Cola products in Turkey, along with certain of their family members, who together sustained serious injuries during a brutal attack initiated by Defendants to prevent their Turkish workers from joining the Nakliyat İş union. Complaint ("Compl.") ¶ 3. Nakliyat İş is a union of transport workers affiliated with DISK, which is the progressive trade union federation of Turkish workers. *Id.*

Plaintiffs, along with other workers at Coca-Cola's Dudullu and Yenibosna bottling facilities, formed the union in approximately May 2005 after 90% of the total 110 workers at the two facilities signed a formal document indicating that they had joined the Union. *Id.* ¶ 21. On

3

May 19, 2005, following the union's application to the Turkish Ministry of Labor for formal recognition, Plaintiffs Erol Türedi, Fahrettin Takici, Fatih Dilbaz, Mustafa Akkin, and Hasan Sirinyurt, who were identified as the original leaders of the organizing effort, were terminated. *Id.* ¶¶ 22, 23. The next day, following a meeting with Coca-Cola representatives in which Coca-Cola's local manger openly stated they would not employ union members as a matter of Coca-Cola policy, roughly fifty other union members employed at the Dudullu facility were fired. *Id.* ¶ 25. This was followed by the termination of another fifty union members at the Yenibosna facility. *Id.* ¶ 27. On July 20, 2005, workers from both facilities gathered at the Dudullu facility, where the Coca-Cola Defendants maintained their headquarters. *Id.* ¶ 28. Many of the workers brought their spouses and children for a planned, peaceful demonstration to protest the illegal terminations and to demand reinstatement to their jobs. *Id.* The workers were so committed to the concept of a peaceful demonstration that they brought their families, including young children, specifically to demonstrate to the Coke Defendants that they intended no violence. *Id.*

Transforming what might have been a local labor dispute into violations of international law, Coca-Cola's local managers unleashed the brutal Çevik Kuvvet, a "special branch" of the Turkish police, on the workers and their families, who were peacefully assembled. *Id.* ¶ 3. Acting at the direction of the local Coca-Cola managers, agents, and/or co-venturers, 1,000 Çevik Kuvvet surrounded the workers and their family members, who by that time numbered about 170 people. *Id.* ¶¶ 29, 32. The Cevik Kuvvet prevented them from leaving the Coca-Cola building, and after receiving the order from Coca-Cola's managers, attacked them with a particularly lethal form of tear gas that is not permitted to be used indoors, and then brutally beat the workers and their family members with clubs. *Id.* ¶ 32. Even after most people were paralyzed from the gas,

4

the Cevik Kuvvet forces continued to club and brutally kick Plaintiffs, and then dragged them to

small police vans. *Id.* ¶ 34. Once inside the vans, they were gassed again, and then taken to a

small, windowless Turkish jail, where they were detained for approximately 10 hours. *Id.* ¶¶ 4,

32-36.

As a result, Plaintiffs suffered extreme physical and mental pain believing they were

being beaten to death. *Id.* ¶¶ 38 - 40. Plaintiffs' injuries were so severe that many need stitches

and hospitalization, particularly due to injuries to the head and eyes, as well as the toxic effects

of tear gas fumes. *Id.* ¶¶ 38-90. For example, Plaintiff Akkin's injuries were so severe that his

picture appeared in the Turkish press showing his eyes swelled shut from the effects of the tear

gas. *Id.* ¶ 46. Plaintiff Takici was struck on the head with an officer's metal helmet and then

sprayed directly in the face with tear gas. *Id.* ¶ 51. Plaintiff Gulen, the wife of one of the

workers, was among those hospitalized, and she had to receive a transfusion of plasma and was

thereafter bedridden for several days. *Id.* ¶ 60. Plaintiff Dilbaz, also the wife of a worker, was

hospitalized and was blinded for several days. *Id.* ¶ 68.

The systematic intimidation and torture experienced by Plaintiffs, done for the purpose of

coercing them to abandon their union, is the direct result of a culture of impunity sanctioned by

Coca-Cola, which openly promotes violence as a means of squelching lawful union activities in

its bottling plants. *Id.* ¶¶ 17-19. Specifically, Defendant Coca-Cola controls a highly organized

network of bottling facilities throughout the world in order to ensure uniform quality and

efficient distribution of Coca-Cola products. *Id.* ¶¶ 1, 91. It maintains absolute control over its

global business from the United States, first by virtue of the "Bottler's Agreement" it maintains

with each bottler that it has created, and second, through complex interlocking relationships

involving joint ownership and joint management with its bottlers around the world. *Id.* ¶¶ 1, 17, 91.

To do business in Turkey, Coca-Cola created Defendant CCI, forming it as a "joint venture" in 1996 with the Anadolu Group, a Turkish company owned by Tuncay Özilhan, one of the most powerful businessmen in Turkey, to conduct its business there. *Id.* ¶ 15. Although Coca-Cola has modified the structure for various reasons since then, the initial joint venture remains in place. At the time of the violence leading to Plaintiffs' injuries, Coca-Cola owned 100% of Defendant Coca-Cola Export, which holds Coca-Cola's 40% interest in CCI. *Id.*

While there may be some aspects of the bottlers' operations that are dealt with by local management, Coca-Cola retains authority over issues that affect product quality and marketing, as well as issues that impact the Coca-Cola brand's image. Compliance with international human rights standards is one of the areas that Coca-Cola controls and/or directs, and does so from the United States. *Id.* ¶ 2. Indeed, Coca-Cola recently ended all doubt about its control over labor relations by hiring a senior manager as the Director of Global Labor Relations. *Id.* Even prior to hiring this new Director, however, representatives of Coca-Cola directly involved themselves in the dispute at Plaintiffs' facilities, in an effort to prevent a market backlash in the U.S. *Id.* ¶¶ 99-101.

Coca-Cola has also established, through various documents and other expressions of company policy, that it is firmly in charge of human rights compliance within the entire Coca-Cola global network. *Id.* ¶¶ 2, 96. Most importantly, Coca-Cola has admitted to both consumers and its shareholders that it has control over all of its bottlers. *Id.* ¶¶ 93-95, 98. Coca-Cola asserts that it can inspect its bottlers to determine their compliance with international human rights

conventions and local laws, and that it can force them to abide by such conventions/laws upon penalty of stripping them of their bottling franchise. *Id.* ¶¶ 93-95.

Coca-Cola has even made direct representations to specific consumers in the United States, including New York, that they can continue to purchase Coca-Cola products without concern that Coca-Cola is profiting from violence against trade union leaders. *Id.* ¶ 94. In one letter responding to an inquiring consumer, Coca-Cola proclaimed that "we require that everyone within the Coca-Cola system abides by the laws and regulations of the countries in which they do business." *Id.*

It has likewise given similar assurances to global trade unions and student groups. For example, in a March 15, 2005 agreement with the International Union of Food Workers (IUF), Coca-Cola, through its Director of Global Labor Relations, represented that in its global system, "Coca-Cola acknowledges that Coca-Cola workers are allowed to exercise rights to union membership and collective bargaining without pressure or interference. Such rights are exercised without fear of retaliation, repression, or any other form of discrimination." *Id.* ¶ 95.

Most recently, to address the growing animosity towards the company for the torture of trade unionists in its bottling plants in Colombia, and to respond to the hostility towards Coca-Cola's initial position that it has nothing to do with the Coca-Cola bottling plants in Colombia, Coca-Cola has mounted a massive public relations response, and has sent numerous Coca-Cola executives and consultants to college campuses around the country. *Id.* ¶ 98.

Through this public relations campaign, Defendant Coca-Cola has been able to actively deceive its consumers and shareholders regarding its human rights and labor practices in general, and the violent attack against Plaintiffs during their protest in particular. *Id.* ¶¶ 93-98, 102. As a

7

direct result, Coca-Cola was able to bolster (or maintain) its market share and profits in the United States, while simultaneously avoiding concrete steps to end the violent repression of trade unionists at its bottling plants. *Id.* ¶¶ 122, 162.

## III.   ARGUMENT

**A.     Plaintiffs' Numerous Claims Based on Coca-Cola's Conduct in the U.S. Must be Heard in This Court, and Defendants Do Not Argue Otherwise.**

Defendants' exclusive focus on Plaintiffs' ATS and TVPA claims as the basis for their *FNC* motion ignores that the rest of Plaintiffs' claims are based on Defendant Coca-Cola's U.S. conduct, which necessarily is not susceptible to FNC challenge.  These include claims for RICO violations, negligence, fraudulent misrepresentation, injurious falsehood, unjust enrichment, and deceptive consumer practices, all of which are based on U.S. conduct by U.S.-based Coca-Cola employees.  Defendants do not argue otherwise, as they are no doubt aware that  Plaintiffs' U.S.-based claims cannot be transferred to Turkey.  Defendants' focus on the ATS/TVPA claims, the sole claims that do involve at least some conduct that occurred in Turkey, presents a very incomplete picture.[3]

Plaintiffs' Complaint focuses largely on Coca-Cola's United States conduct in three distinct ways.  First, Coke conspired to protect its U.S. market, and the profits derived from it, by engaging in a massive public relations campaign to misrepresent its offshore labor practices to consumers and shareholders in New York and throughout the United States. *Id.* ¶¶ 122-23, 162-63.  It is this conduct that supports Plaintiffs' litany of claims for RICO violations, negligence,

---

[3] Defendants may argue that they intended to focus first on the federal claims, but the existence of several distinct claims based on U.S. law and conduct is extremely significant to the *FNC* assessment.  As the discussion below in Section III(B) demonstrates, courts will not partially dismiss a case for *FNC* if at least part of the case must be heard in the U.S.

fraudulent misrepresentation, injurious falsehood, unjust enrichment, and deceptive consumer practices.  Second, Plaintiffs' Complaint alleges that Coke, acting from the United States, directed and controlled the summary discharge of workers attempting to unionize at its bottling plants in Turkey.  *Id.* ¶¶ 14-16, 20-37, 91-107.  Third, Coke adopted policies that permitted the severe violence used to retaliate against the Turkish workers for forming a union.  *Id.* ¶¶ 93-98.  As explained below, these allegations, which at the pleadings stage must be taken as true, are sufficient to support Plaintiffs' claims based on Defendant Coca-Cola's conduct in the United States.  The U.S. has a strong interest in adjudicating these claims, and it is accordingly inappropriate to transfer any of them to Turkey.

1.   **Plaintiffs State a Well-Pleaded RICO Claim Based on a Conspiracy Conducted by Coca-Cola from the United States.**

   a.   **Plaintiffs allege a continuous pattern of racketeering predicate acts under RICO.**

Plaintiffs allege that Coca-Cola conspired to violate RICO by engaging in a pattern of racketeering activities over a period of over ten years in order to unlawfully increase its market share and profits in the United States.  In furtherance of this conspiracy, Coca-Cola, through control over its local bottlers, engaged in several predicate acts—murders, threats of murder, extortion, and fraud—which substantially affected the United States, and which directly caused injuries to Plaintiffs' property interests.[4]

---

[4] While the details of these predicate acts are not specifically alleged in the RICO section of the Complaint, they do appear throughout the Complaint, which must be read as a whole. *See, e.g.*, *Yoder v. Orthomolecular Nutrition Inst., Inc.*, 751 F.2d 555, 562 (2d Cir. 1985) ("It is elementary that, on a motion to dismiss, a complaint must be read as a whole, drawing all inferences favorable to the pleader."). However, should the Court find it necessary, Plaintiffs are prepared to amend the Complaint to allege these acts within the RICO section.

Specifically, the pattern of racketeering behavior alleged in the Complaint begins in the
1990s with Coca-Cola arranging, through its local managers in Colombia, for the murders and
death threats of union leaders working to organize Coca-Cola bottling plants in that country. *Id.*
¶ 17. The pattern continued with CCI, under the control of Coca-Cola, arranging for the Turkish
police to torture Plaintiffs, its former employees, who were engaged in peaceful protests against
Coca-Cola and CCI. *Id.* ¶¶ 32-107. Thereafter, Coca-Cola continued to extort the value of
union-free labor at its Turkish bottling plants by threatening and torturing its employees through
its local bottling agent, and through the Turkish police. *Id.* ¶¶ 18-89. Finally, Coca-Cola carried
out a public relations campaign through which it necessarily engaged in mailing and
communicating by wire false statements concerning its human rights and labor practices with the
intent to fraudulently obtain money from its consumers and shareholders. *Id.* ¶¶ 93-107.
Together, these act constitute a "pattern of racketeering" activity and predicate acts under RICO,
18 U.S.C. §§ 1961(5) and 1961(1)(A)-B, which define a pattern of racketeering as requiring two
acts of racketeering activity, the last of which occurred within ten years after the prior act.

### b. <u>Plaintiffs' allegations also establish extraterritorial subject matter jurisdiction under RICO.</u>

Plaintiffs' aforementioned allegations that Coca-Cola engaged in racketeering activities
and predicate acts which Coca-Cola coordinated from the United States satisfy both the
"conduct" and "effects" tests set out in *North South Fin. Corp. v. Al Turki*, 100 F.3d 1046, 1052
(2d Cir. 1996). The "conduct" test allows for jurisdiction over domestic conduct that directly
caused an injury or loss abroad; the "effects" test allows for jurisdiction over predominately
foreign conduct that has a substantial effect on the United States. *Id.* at 1051-52.

10

Again, the basis of Plaintiffs' Complaint is that from the U.S., Defendant Coca-Cola,

acting through its instrumentality CCI, coordinated the torture and summary discharge of

Plaintiffs, Compl. ¶¶ 23-25, 27, unleashing the Turkish police on them during peaceful protests,

*id.* ¶¶ 25, 30-37, and that Coca-Cola thereafter engaged in a massive cover-up campaign towards

U.S. consumers and shareholders, *id.* ¶¶ 93-102.  This series of racketeering activities clearly

satisfies the "conduct" test. *See, e.g., Nat'l Group for Communs. & Computers Ltd. v. Lucent*

*Techs., Inc.*, 420 F. Supp. 2d 253, 262-63 (S.D.N.Y. 2006) (holding that plaintiffs' allegations

that predicate acts of bribery took place in the United States were sufficient to satisfy the

"conduct" test, notwithstanding that the Court was "acutely aware" that many key events took

place in Saudi Arabia, and concluding that even when jurisdiction is a "close question," if "some

of the conduct at issue has 'significant and material contact(s)' to the United States," then

jurisdiction is appropriate) (quoting *North South Fin.*, 100 F.3d at 1052).

Plaintiffs also allege that Coca-Cola conspired to profit from its unlawful use of violence

to suppress trade unions at its bottling plants in Turkey by engaging in fraud in the United States.

Compl. ¶¶ 93-107.  By actively deceiving, via mail and wire communications, its consumers and

shareholders regarding its human rights and labor practices in general, and regarding the violent

attack against Plaintiffs during the protest in particular, *id.* ¶¶ 93-98, 102, Coca-Cola aimed to

bolster its market share and profits in the United States. *Id.* ¶122.  Specifically, Coca-Cola

engaged in an active scheme to depress the cost of labor at its bottling facilities around the world

by exploiting workers and using violence to suppress union organizing among them.  This

unlawful scheme resulted in lower production costs and therefore greater profits, giving Coca-

Cola an unfair advantage in the U.S. beverage market.  Thus, although Plaintiffs' injuries

11

occurred in Turkey, Defendant Coca-Cola's racketeering activities had a substantial effect in the

United States, thereby also satisfying the "effects" test.  *See, e.g., Wiwa v. Royal Dutch*

*Petroleum Co.*, 2002 WL 319887, at \*20-22 (S.D.N.Y. Feb. 28, 2002) (holding that exploitation

of oil fields in Nigeria intended to give company an unfair advantage in United States oil market

constituted a substantial effect on the United States sufficient to meet the "effects" test).

### c. **Plaintiffs allege injuries to property**.

As a result of Defendant Coca-Cola's racketeering activities, Plaintiffs also suffered

injuries to property and thereby have standing under RICO, 18 U.S.C. § 1964(c).  Plaintiffs were

deprived of their right to organize, terminated from their jobs without just cause, and have had

their prospects for future employment severely hindered by Coca-Cola's violent union-

suppressing and blacklisting activities.  Compl. ¶¶ 18-107.  The Ninth Circuit has held that an

interference with a person's right to current and/or prospective employment is an injury to

property under RICO.  *See Diaz v. Gates*, 420 F.3d 897, 899-901 (9th Cir. 2005) (en banc)

(holding that interference with contract or with prospective business relations is an injury to

property under RICO); *Mendoza v. Zirkle Fruit*, 301 F.3d 1163, 1168 & n.4 (9th Cir. 2002)

(holding that the "legal entitlement to business relations unhampered by schemes prohibited by

the RICO statute" is a property interest sufficient for RICO standing).

Unlike the aforementioned cases, Defendants' citations to Second Circuit cases holding

that personal injuries are insufficient for RICO standing are inapplicable, as they involved

plaintiffs seeking recovery solely for personal injuries.[5]  In contrast, the injuries suffered by

---

[5] *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 241 (2d Cir. 1999); *Williams v. Dow Chem. Co.*, 255 F. Supp. 2d 219, 225 (S.D.N.Y. 2003).

Plaintiffs in this case, as in the Ninth Circuit cases, involve their loss of the right to work and unionize, rights which are not associated or derived from a personal injury, and thus constitute proprietary interests under RICO. *See Diaz*, 420 F.3d at 900; *Mendoza*, 301 F.3d at 1168.

### 2. Plaintiffs Also State Several Well-Pleaded Claims under New York Law That Focus Primarily on Coca-Cola's U.S. Conduct.

#### a. Negligence

Plaintiffs' negligence claim challenges Coca-Cola's decision to obtain the services of the Çevik Kuvvet, a clandestine branch of the Turkish police, to break up Plaintiffs' peaceful demonstration. Under New York law, a party may be held liable for negligent hiring, retention, and/or supervision of an independent contractor if the party knew or should have known that the contractor had a propensity to engage in conduct of the kind that caused the plaintiff's injuries. *See, e.g.*, *Bellere v. Gerics*, 759 N.Y.S.2d 105, 107 (2d Dep't 2003); *Maristany v. Patient Support Servs., Inc.*, 693 N.Y.S.2d 143, 144-45 (1st Dep't 1999); *Doe v. Povich*, 768 N.Y.S.2d 571, 580 (Sup. Ct. 2003). In this case, Plaintiffs allege that Coca-Cola, exercising direction and control over CCI from the United States, violated a reasonable duty of care that it owed to Plaintiffs when it obtained the services of the Çevik Kuvvet, despite the fact that Coca-Cola knew or should have known that the Çevik Kuvvet had a propensity for brutal and violent behavior, thereby stating a viable claim of negligence. *See* Compl. ¶¶ 130-34. *See also Doe v. Exxon Mobil Corp.*, 2006 WL 516744, at *3-4 (D.D.C. Mar. 2, 2006) (holding that Indonesian torture victims stated viable negligence claim against defendant corporations where defendants obtained the services of Indonesian military to provide security for oil pipeline, despite knowledge that soldiers had committed human rights violations). Even if Coca-Cola itself did not

13

directly engage in negligent behavior, it is jointly and severally liable for the acts of CCI, the

joint venture it owns through Coke Export.  Compl ¶ 15.  *See, e.g., Peterson v. Manitowok Co.*,

25 N.Y.2d 412, 419 (1969); *Faison v. Nationwide Mortgage Corp.*, 839 F.2d 680, 685 (D.C. Cir.

1988).

### b. Deceptive Practices

Plaintiffs also assert a well-pleaded statutory claim of deceptive practices, in violation of

New York General Business Law ("NY GBL") § 349, for injuries caused them by Coca-Cola's

massive public relations campaign in New York and throughout the United States.  Section 349

proscribes "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in

the furnishing of any service" and creates a private right of action for "any person who has been

injured by reason of any violation of this section." § 349(a), (h).  To state a claim under § 349, a

plaintiff must allege that the defendant engaged in deceptive conduct, which was likely to

mislead, in a material way, "a reasonable consumer acting reasonably under the circumstances,"

*Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (2000), which was directed toward consumers in New

York, *see Goshen v. Mutual Life Ins. Co.*, 98 N.Y.2d 314, 324-25 (2002), and which caused the

plaintiff an actual injury, "though not necessarily pecuniary harm," *Stutman*, 95 N.Y.2d at 29.

Because of the broad remedial legislative intent underlying § 349, a plaintiff need not be a

consumer, or even a New Yorker, to have standing to sue.  *See Goshen*, 98 N.Y.2d at 325 ("[O]ur

General Business Law analysis does not turn on the residency of the parties."); *Meachum v.

Outdoor World Corp.*, 652 N.Y.S.2d 749, 750 (2d Dep't 1997) (holding that Pennsylvania

consumers had standing to sue for defendant's advertising directed toward consumers in New

York, even though plaintiffs' only contact with defendants was in Pennsylvania); *Vitolo v. Dow*

14

*Corning Corp.*, 634 N.Y.S.2d 362, 366 (Sup. Ct. 1995) (noting that § 349's "definition of

'person' is much broader than 'consumer,' embracing all possible plaintiffs").[6] Rather, "'the

gravamen of the complaint [must be] consumer injury or harm to the public interest.'" *Securitron*

*Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995), *cert. denied*, 516 U.S. 1114

(1996). Neither reliance nor privity are required elements of a § 349 claim, only that the

plaintiff's injury was caused by defendant's deceptive practices. *Stutman*, 95 N.Y.2d at 29-30;

*Pelman v. McDonald's Corp.*, 396 F.3d 508, 510-12 (2d Cir. 2005).

Plaintiffs have sufficiently pled the elements of a § 349 claim. Coca-Cola's massive

public relations campaign, described in *The Nation* article attached as Exhibit A, which was

directed at consumers in New York and throughout the United States, is a paradigmatic example

of "consumer-oriented" conduct.[7] Coca-Cola's misrepresentations concerning the labor practices

of its foreign bottlers were materially misleading to those New York consumers whose

purchasing decisions might have been affected by their knowledge of Coca-Cola's labor

---

[6] *See also generally* Joseph Thomas Moldovan, *New York Creates a Private Right of Action to Combat Consumer Fraud: Caveat Venditor*, 48 Brook. L. Rev. 509 (1982) (collecting and interpreting legislative history).

[7] *See, e.g., Karlin v. IVF America*, 93 N.Y.2d 282, 293 (N.Y. 1999) ("Defendants' alleged multi-media dissemination of information to the public is precisely the sort of consumer-oriented conduct that is targeted by [§ 349]."); *Verizon Directories Corp. v. Yellow Book USA, Inc.*, 338 F. Supp. 2d 422, 428 (E.D.N.Y. 2004) ("The threshold requirement that a defendant's acts be "consumer-oriented" is satisfied because [defendant's false] claims were part of a broad campaign that probably had an impact on consumers in New York state."); *In re MTBE Prods. Liab. Litig.*, 175 F. Supp. 2d 593, 631 (S.D.N.Y. 2001) (holding that defendants' public relations campaign in which they made "misrepresentations in order to mislead the public and garner consumer acceptance of gasoline containing MTBE . . . is sufficiently consumer-oriented" to be actionable under § 349).

practices, particularly students and administrators at universities.  *See* Compl. ¶¶ 95-98.[8]  Finally,

Coca-Cola's public relations campaign caused Plaintiffs actual injury, in that it enabled Coca-

Cola to continue using violence against them to suppress trade unions at its foreign bottlers,

while projecting a false image of Coca-Cola as an ethical company to New York consumers.  *Id.*

¶¶ 163-68. If Defendant Coca-Cola had not known that it could cover up its foreign labor

practices by misleading consumers with a massive public relations campaign, it would have

never engaged in the conduct that injured Plaintiffs, and would have been required to implement

effective preventive mechanisms. *Id.* ¶159.  Plaintiffs' § 349 claim, thus, falls squarely within the

broad remedial purpose of the statute. Plaintiffs seek "to secure an honest marketplace" for New

York consumers. *Goshen*, 98 N.Y.2d at 324.

### c.  <u>Fraudulent misrepresentation and injurious falsehood</u>

Plaintiffs have also adequately pled common law claims of fraudulent misrepresentation

and injurious falsehood for their injuries caused by Coca-Cola's public relations campaign.  As

previously stated, Plaintiffs allege that Coca-Cola made knowing misrepresentations that Coca-

Cola required its foreign bottlers to allow workers to exercise their fundamental rights to union

membership without fear of retaliation or discrimination.  Compl. ¶¶ 152-54, 158-59.  Further,

Plaintiffs allege that Coca-Cola made those misrepresentations in order to induce Plaintiffs to

continue working for Coca-Cola bottlers and to induce consumers to continue buying Coca-Cola

products, and that both Plaintiffs and consumers did rely on those misrepresentations.  *Id.*

---

[8] *See, e.g.*, *In re MTBE Prods. Liab. Litig.*, 175 F. Supp. 2d at 631 (finding that
misrepresentations about gasoline additive's environmental safety were materially misleading).

Consequently, Plaintiffs allege they attempted to form a union but were subject to
discrimination and brutal retaliation at the hands of Coca-Cola and the Çevik Kuvvet, suffering
"pecuniary loss due to physical harm, mental anguish, loss of wages, and loss of benefits," and
Plaintiffs were also injured by Coca-Cola's use of the misrepresentations as a cover to mislead
consumers, as described above. *See id.* ¶¶ 153-56, 158-60.  Under New York law, these
allegations state claims of both fraudulent misrepresentation[9] and injurious falsehood.[10]

### d.  Unjust enrichment

Finally, Plaintiffs also assert that Coca-Cola was unjustly enriched in the U.S. as a result
of its U.S. conduct.  Compl. ¶¶ 161-63.  To state a claim of unjust enrichment under New York
law, a plaintiff must allege that (1) "the defendant was enriched" (2) "at the plaintiff's expense,"
and that (3) "equity and good conscience require the plaintiff to recover the enrichment from the
defendant."  *Golden Pac. Bancorp v. FDIC*, 375 F.3d 196, 203 n.8 (2d Cir. 2004) (citing *Lake*

---

[9] *See, e.g.*, *Jablonski v. Rapalje*, 788 N.Y.S.2d 158, 162 (2d Dep't 2005) (listing the
elements of fraudulent misrepresentation as "(1) a misrepresentation or omission of material fact
which was false and known to be false by the defendant, (2) [that] the misrepresentation was
made for the purpose of inducing plaintiff to rely upon it, (3) justifiable reliance of the plaintiff
on the misrepresentation or material omission, and (4) injury," and noting that "'whether a party
could have ascertained the facts with reasonable diligence so as to negate justifiable reliance is a
factual question'") (quoting *Country World v. Imperial Frozen Foods Co.*, 589 N.Y.S.2d 81, 82
(2d Dep't 1992)); *accord Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 421 (1996).

[10] *See, e.g.*, *Penn-Ohio Steel Corp. v. Allis-Chalmers Manuf. Co.*, 184 N.Y.S.2d 58, 61
(1st Dep't 1959) ("'A person who, with knowledge of its falsity, makes an untrue statement
concerning another which he realizes will harm the other is liable to the other for such resulting
harm as he should have realized might be caused by his statement.'") (quoting Restatement of
Torts § 873); *Diehl & Sons, Inc. v. Int'l Harvester Co.*, 445 F. Supp. 282, 291 (E.D.N.Y. 1978)
("'Injurious falsehood . . . may consist of publication of matter derogatory . . . to [the plaintiff's]
business in general, or even to some element of his personal affairs, of a kind calculated to
prevent others from dealing with him, or otherwise to interfere with his relations with others to
his disadvantage.'") (quoting W. Prosser, *Torts* § 128).

*Minnewaska Mtn. Houses, Inc. v. Rekis*, 686 N.Y.S.2d 186, 188 (3d Dep't 1999)); *see also Design Strategies, Inc. v. Davis*, 384 F. Supp.2d 649, 676 (S.D.N.Y. 2005).[11]

Here, Coca-Cola was enriched, at Plaintiffs' expense, when it obtained the services of the Çevik Kuvvet to attack and torture Plaintiffs and suppress their attempts to form a trade union, thus sparing itself the expense or loss that it would have incurred by respecting the human rights of the workers and allowing trade unions to form at its foreign bottlers. *See Blue Cross of Cent. N.Y. v. Wheeler*, 461 N.Y.S.2d 624, 626 (4th Dep't 1983) ("A person may be unjustly enriched not only where he receives money or property, but also where he receives a benefit. He receives a benefit where his debt is satisfied or where he is saved expense or loss.") (citing Restatement of Restitution § 1); *accord 3105 Grand Corp. v. City of N.Y.*, 288 N.Y. 178, 181 (1942); *Lake Minnewaska*, 686 N.Y.S.2d at 188. Coca-Cola's direct representations to the public that it requires its foreign bottlers to respect the human rights and rights to unionize of the workers, which were relied on both by consumers and by Plaintiffs, created equitable obligations between Coca-Cola and Plaintiffs irrespective of whether Coca-Cola actually exercised its potential control over the labor practices of its Turkish bottling plants. *See U.S. East Telecomms., Inc. v. US West Comms. Servs., Inc.*, 38 F.3d 1289, 1296-1300 (2d Cir. 1994) (holding general contractor liable for unjust enrichment based on direct representations to second-tier subcontractor that it would be paid, despite absence of contractual relationship between the

---

[11] As noted by this Court, unjust enrichment "is grounded on equitable principles embodied under the concept of quasi-contracts, defined by the New York Court of Appeals as 'not really a contract at all, but rather a legal obligation imposed by law . . . where there has been no agreement . . . to assure a just and equitable result.'" *Mathias v. Jacobs*, 238 F. Supp. 2d 556, 572 (S.D.N.Y. 2001) (quoting *Clark-Fitzpatrick Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388-89 (1987)).

parties). Further, Plaintiffs' unjust enrichment claim, stemming from the brutal attack and torture they suffered, is outside the scope of any express employment contract that Plaintiffs may have had with Coca-Cola and/or its agents and subsidiaries. *See Hochman v. LaRea*, 789 N.Y.S.2d 300, 302 (2d Dep't 2005) (unjust enrichment claim available, despite express contract between the parties, "where the contract does not cover the dispute in issue"); *EUA Cogenex Corp. v. N. Rockland Cent. Sch. Dist.*, 124 F. Supp. 2d 861, 873 (S.D.N.Y. 2000) (same). Finally, in this case, given that Plaintiffs allege that Coca-Cola is engaged in a global conspiracy to profit from tortious and fraudulent conduct, "equity and good conscience," under the totality of the circumstances, "militate against allowing [Coca-Cola] to retain what [Plaintiffs] seek[] to recover." *Briarpatch Ltd. v. Phoneix Pictures Inc.*, 373 F.3d 296, 306 (2d Cir. 2004). *See also Onanuga v. Pfizer*, 369 F. Supp. 2d 491, 501 (S.D.N.Y. 2005) (courts reviewing an unjust enrichment claim "'generally . . . look to see whether the defendant's conduct was tortious or fraudulent'"); *Lake Minnewaska*, 686 N.Y.S.2d at 188 (in reviewing an unjust enrichment claim, "principles of equity mandate consideration of the totality of the circumstances . . . including, *inter alia*, the severe adverse consequences flowing from [one party's] efforts to vindicate an entitlement to which [the other party] sought to deny him"). Accordingly, Plaintiffs' unjust enrichment claim is appropriate for adjudication in this Court.

**B.      That Plaintiffs Have Substantial Claims Based on U.S. Conduct, Which Must be Heard in the U.S., Prevents Transfer of Any Part of their Case.**

It is well established that a *FNC* motion to transfer to an alternative forum can only be considered if the entire case and all parties can be transferred. *See Crimson Semiconductor, Inc. v. Electrnum*, 629 F. Supp. 903, 908 (S.D.N.Y. 1986) ("[Defendant] has not sustained its

19

burden of showing that an 'adequate' alternative can hear the '*whole*' case exists. For this reason, we must deny the motion to dismiss on ground of *[FNC]*.") (emphasis added). *See also Vasquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665, 671 (5th Cir. 2003) (holding alternative forum must be able to hear the entire case); *In re Disater at Riyadh Airport*, 540 F. Supp. 1141, 1144 (D.D.C. 1982) (holding "[a]s a prerequisite, the court must establish whether an adequate alternative forum exists which possesses jurisdiction over the *whole* case) (emphasis added).

Here, as demonstrated in the preceding section, Plaintiffs' claims for RICO violations, negligence, fraudulent misrepresentation, injurious falsehood, unjust enrichment, and deceptive consumer practices are all premised on Coca-Cola's conduct in the United States, and are based on U.S. law, and on documentary evidence and witnesses located in the United States, including New York. Recognizing this, courts have refused to dismiss U.S.-based claims in favor of a foreign forum, even if there is also conduct which occurred outside of the U.S. For example, in *ALPA S.A. Agroindustrial Alemano v. ACLI Int'l*, 573 F. Supp. 1070, 1077 (S.D.N.Y. 1983), the Court refused to dismiss the plaintiff's fraud claims in favor of Germany, although defendant argued that "virtually all the events of any consequence took place in Germany and that the real defendants, witnesses, and reliable evidence are in Germany." Rather, in denying *FNC* dismissal, the court rejected Defendants' position stating:

> this position would be accurate if the action were only one for fraud, for many of the witnesses who possess knowledge of the related fraudulent activities are located in Germany, along with records and papers pertaining to the fraudulent scheme. However, this is not primarily an action sounding in fraud. Rather [plaintiff] charges [defendant] primarily with breach of contract that happened to contribute to the fraud. Under [plaintiff's] primary claim, it is [defendant's] conduct in the United States that is critical. *Id.* at 1077.

20

The *ALPA* Court's reasoning applies with even greater force with respect to Plaintiffs'

deceptive business practice and related fraudulent misrepresentation, injurious falsehood, and

unjust enrichment claims. *See, e.g., Minibooster Hydraulics v. Scanwill Fluid Powers*, 315

F. Supp. 2d 286, 290 (S.D.N.Y. 2004) ("Plaintiff alleges unfair competition and trademark

infringement with respect to sales of its products in the United States. Accordingly, the proof of

these violations, and witnesses to these transactions, are in this country."); *Firma Melodiya v.

ZYX Music GmbH*, 882 F. Supp. 1306, 1318 (S.D.N.Y.1995) (holding "the interest in keeping

localized controversies at home clearly supports keeping this case with this Court. The central

issues to this case concern alleged violations of United States trademark and copyright laws, not,

as ZYX asserts, foreign contract law. In addition, the disputed compact discs are being sold in

New York. Furthermore, the need to analyze foreign law, if at all, is slight, and at any rate, is not

dispositive of a motion to dismiss."); *Modern Computer Corp. v. His K. Ma*, 862 F. Supp. 938,

949 (E.D.N.Y. 1994) (refusing to dismiss case in favor of Taiwan forum because plaintiffs

allegations of unfair competition were based on New York law).[12]

Here, as with the above cases, there is no question that New York has an inherent interest

in protecting its consumers from such harms as deceptive business practices, and that its courts

have the ability to provide effective, public remedies for such acts, whereas Turkey has no such

---

[12] *See also Jose Armando Bermudez & Co. v. Bermudez Int'l*, 2000 WL 1225792, at *5
(S.D.N.Y. Aug. 29, 2000) (holding that "[t]he public interest in having local controversies
adjudicated locally is particularly important . . . . The U.S. trademark laws are primarily
consumer protection laws, designed to shield domestic consumers from fraud and deception in
the marketing and sales of products. . . . Defendants have allegedly sold deceptively-packaged
rum in the United States, and New York consumers have allegedly been deceived. The public,
and in particular a New York court, would therefore have a direct interest in addressing the
allegedly infringing sales.").

21

interest, and indeed would be unable to even hear Plaintiffs' U.S.-based claims.[13]  The law is

clear that where the foreign court cannot (or should not) entertain the particular cause of action at

issue, such a forum is inherently inadequate.  *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255

n.22 (1981) (holding the alternative forum must permit litigation of the subject matter of the

dispute); *Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.*, 78 F.R.D. 445 (D. Del.1978) (refusing

*FNC* dismissal because there was no generally codified legal remedy in the alternative forum for

the particular tort claims asserted).

　　　　Thus, because all of Plaintiffs' domestic claims cannot be heard in Turkey, and New

York has a strong public interest in adjudicating these claims, *FNC* dismissal of Plaintiffs' case

is inappropriate.  Indeed, as Judge Oberdorfer recently noted in a very similar case, "[u]ltimately,

the United States as leader of the free world, has an overarching vital interest in the safety,

prosperity, and consequences of the behavior of its citizens, particularly its super-corporations

conducting business in one or more foreign countries."*Exxon Mobil Corp.*, 2006 WL 516744, *2.

**C.      Turkey is Not an Adequate, Alternative Forum Even for Plaintiffs' ATS/TVPA
　　　　Claims, Which Are Backed by a Strong U.S. Policy Favoring the U.S. Forum.**

　　　　While Plaintiffs' claims are largely based on U.S. conduct, which obviates the application

of FNC to any of their claims, FNC dismissal is nevertheless inappropriate with respect to their

ATS and TVPA claims. First, Defendants ignore that even Plaintiffs' ATS and TVPA claims are

based in part of U.S. conduct.  *See* Compl. ¶¶ 91-100.  Second, and more fundamentally,

---

[13] *See* Section III (E), *infra*, showing that Defendants have failed to meet their burden of
establishing that Turkey can hear any, let alone all, of Plaintiffs' claims. Indeed, Defendants'
experts do not even discuss Plaintiffs' non-ATS and TVPA claims, and certainly do not opine
whether a Turkish court would have jurisdiction over such claims.

Defendants ignore that the ATS and TVPA are two federal statutes that reflect a Congressional policy which strongly favors Plaintiffs' claims for torture being heard in a U.S. forum.

The TVPA, passed in 1992, which is more detailed in its provisions than the ATS, and which has a much more extensive and accessible legislative history, embodies a clear congressional intent that the FNC doctrine is inapplicable to torture claims under most circumstances:

> Judicial protection against flagrant human rights violations is often least effective in those countries where such abuses are most prevalent. A state that practices torture and summary execution is not one that adheres to the rule of law. Consequently, ***the TVPA is designed to respond to this situation by providing a civil cause of action in U.S. courts for torture committed abroad.***

S. Rep. 102-249, at 3-4 (1991) (emphasis added).[14]

Relying on this legislative history, the Second Circuit has recognized that:

> the formulations of the [TVPA] convey the message that torture committed under color of law of a foreign nation in violation of international law *is 'our business,'* as such conduct not only violates the standards of international law but also as a consequence violates our domestic law. . . . If in cases of torture in violation of international law our courts exercise their jurisdiction conferred by the [ATS] only for as long as it takes to dismiss the

---

[14] It is important to note that while the TVPA allows a court to decline jurisdiction if Defendants can show that the claimant has not exhausted adequate and available remedies in their home country, exhaustion is not synonymous with *FNC* as exhaustion is a much narrower ground for dismissal. *See* Kathryn Boyd, *The Inconvenience of Victims: Abolishing Forum Non Conveniens in U.S. Human Rights Litigation*, 39 Va. J. Int'l L. 41, 65-66 (1998) *(*explaining that "[t]he TVPA's exhaustion of remedies provision is clearly not a codification of congressional intent for courts to consider convenience factors as the [*FNC*] doctrine requires. . . This is a much lower standard for a plaintiff to overcome than the [*FNC*] presumption against foreign plaintiffs, and the unbalanced weighing of convenience factors against them"). *See also* Ved P. Nanda & David K. Pansius, *Int'l Law Torts*, 2 Litigation of Int'l Disputes in U.S. Courts § 14:9 (2004).

> case for *forum non conveniens*, we will have done little to enforce
> the standards of the law of nations.

*Wiwa v. Royal Dutch Petro. Co.*, 226 F.3d 88, 106 (2d Cir. 2000) (emphasis added), *cert. denied*,

532 U.S. 941 (2001). *See also Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244

F. Supp. 2d 289, 339 (S.D.N.Y. 2003) (noting "the strong United States interest in vindicating

international human rights violations"); *Tachiona v. Mugabe*, 234 F. Supp. 2d 401, 408

(S.D.N.Y. 2002), *rev'd on other grounds sub nom. Tachiona v. United States*, 386 F.3d 205

(2d Cir. 2004) (noting that "the United States has a significant interest in providing a forum for

the adjudication of claims under the [ATS] alleging certain violations of international human

rights law, thereby advancing the realization of the values embodied in universally recognized

norms").

    Although the *Wiwa* court recognized that application of FNC may be appropriate to

TVPA claims in "rare instances," the TVPA's strong policy in favor of plaintiffs' claims being

heard in a U.S. forum substantially alters the FNC analysis. Defendants, to prevail here, must

meet a heavier burden than if this case were an ordinary tort or commercial action. *Wiwa*, 226

F.3d at 100, 103-08. *See also Piper Aircraft*, 454 U.S. at 249-50 (emphasizing "the need to retain

flexibility" in applying [FNC] principles to different kinds of cases, due to the fact-specific

nature of the doctrine); *Abiola v. Abubakar*, 267 F. Supp. 2d 907, 918 (N.D. Ill. 2003) ("A

motion for dismissal for [FNC] raises special concerns when the claims against the defendant are

brought under the [ATS] for torture and other human rights abuses.").

24

**D.    Plaintiffs' Choice of Forum, Even as Citizens and Residents of Turkey, is Still Entitled to Deference.**

Defendants incorrectly assert that Plaintiffs' choice of forum is entitled to no weight because they are foreigners.  Coca-Cola Br. at 11-12.  Rather, the Second Circuit has adopted a "sliding scale" approach to deference to a foreign plaintiff's choice of forum, with more substantial deference being given to plaintiffs who chose to file suit in the United States based on "reasons that the law recognizes as valid." *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71-72 (2d Cir. 2001) (en banc).  "Stated differently, the greater the plaintiff's or the lawsuit's bona fide connection to the United States . . .  the more . . . considerations of convenience favor . . . . [hearing] the lawsuit in the United States." *Id.* at 72.

Plaintiffs in this case have a variety of legitimate reasons for bringing their suit in a U.S. forum.  First and foremost, as noted in § III A, *supra*, a substantial core of Plaintiffs' claims focus on Coca-Cola's U.S. conduct, alleging in particular that Coca-Cola has engaged in a global conspiracy, based here in the U.S., to use violence to suppress trade unions at its foreign bottlers.[15]  As recognized by the Second Circuit in a different case against Coca-Cola and Coca-Cola Export, "[i]t was perfectly reasonable . . . for the plaintiffs to bring their action against Coca-Cola, the only U.S. company involved, in the United States." *Bigio v. Coca-Cola*, 2006 WL 1236789, at *2 (2d Cir. May 9, 2006).  In that case, Coca-Cola and Coca-Cola Export moved

---

[15] Plaintiffs' allegations of U.S. conduct and legal claims arising therefrom negate Defendants' accusation that Plaintiffs are engaging in forum shopping.  Indeed, as the Second Circuit has recognized, it is no less common for defendants to invoke "the doctrine of [FNC] not because of genuine concern with convenience but because of [their own] forum-shopping reasons.  District courts should therefore arm themselves with an appropriate degree of skepticism in assessing whether the defendant has demonstrated genuine inconvenience and a clear preferability of the foreign forum." *Iragorri*, 274 F.3d at 75.

to dismiss for *FNC* because the plaintiffs were foreign and their injuries occurred in a foreign country. The Second Circuit, however, found that the plaintiffs' decision to sue Coca-Cola in New York was "entitled to considerable deference," although they were foreign plaintiffs, because the focus of the case was on the Coca-Cola defendants' U.S. conduct. *Id.*

Accordingly, Plaintiffs' choice of forum is still entitled to considerable deference, notwithstanding their Turkish residency and citizenship, particularly in the context of the strong U.S. policy interests, as recognized by this Circuit, favoring resolution of ATS and TVPA claims by U.S. courts.[16] *See, e.g., Bigio*, 2006 WL 1236789, at *2; *Iragorri*, 274 F.3d at 71-73; *Ravelo Monegro v. Rosa*, 211 F.3d 509, 514 (9th Cir. 2000); *Lony v. E.I. DuPont de Nemouirs & Co.*, 886 F.2d 628, 633 (3d Cir. 1989) (in cases involving foreign plaintiffs, defendants must still establish a "strong preponderance" in favor of dismissal).

---

[16] Defendants' citation of *Adamu v. Pfizer, Inc.*, 399 F. Supp. 2d 495, 505 n.6 (S.D.N.Y. 2005), and *Flores v. So. Peru Copper Corp.*, 253 F. Supp. 2d 510, 529 (S.D.N.Y. 2002), *aff'd on other grounds*, 414 F.3d 233 (2d Cir. 2003), to argue that Plaintiffs' ATS/TVPA claims do not entitle their choice of forum to greater deference, is inapposite. In both of those cases, the court held that the plaintiffs had not stated a valid claim under the ATS. *See Adamu*, 399 F. Supp. 2d at 501; *Flores*, 253 F. Supp. 2d at 519. In any event, to the extent that these decisions conflict with *Wiwa*, the Second Circuit's holding controls. Defendants also cite to *Aguinda v. Texaco*, 945 F. Supp. 625 (S.D.N.Y. 2001), *aff'd*, 303 F.3d 470 (2d Cir. 2002), in support of this proposition. In *Aguinda*, however, the Second Circuit reaffirmed *Wiwa*'s recognition of a strong U.S. policy in favor of adjudicating ATS/TVPA claims in U.S. courts, while declining to consider whether a similar policy interest existed with respect to the environmental claims at issue in that case. *Aguinda*, 303 F.3d at 480 n.3.

**E.**   **Defendants Have Not Met Their Burden of Showing that Turkey is an Adequate Forum.**

Given the deference due to Plaintiffs' choice of forum, the fact that many of Plaintiffs' claims focus on Coca-Cola's conduct in the U.S.,[17] and the strong U.S. policy favoring adjudication of Plaintiffs' ATS/TVPA claims in the U.S., Defendants' burden in advocating for *FNC* dismissal is especially heavy, and most certainly has not been met. *See, e.g., Talisman*, 244 F. Supp. 2d at 335 (noting the well-established principle that it is the defendant's burden to establish that an adequate, alternative forum exists).

Plaintiffs allege that they "and other victims of police brutality do not have access to an independent or functioning legal system within Turkey." Compl. ¶ 8. Further, Plaintiffs have "no effective remedy available in Turkey . . . as they cannot bring an action against the primary perpetrator of their injuries, Coca-Cola and/or Coca-Cola Export," and "they are unable under Turkish law to bring a claim [against CCI] for the injuries inflicted by the Çevik Kuvvet . . . despite CCI's direct role in unleashing the brutal police on them." *Id.* Moreover, Plaintiffs allege that, even if they "could in the abstract bring an action for some form of recovery from any of the Coca-Cola Defendants, the justice system in Turkey is notorious for its failure to bring powerful and influential parties to justice." *Id.* ¶ 9. In particular, Plaintiffs allege, Turkish courts are inhospitable to claims of violence against trade unionists. *Id.*

Plaintiffs' allegations are corroborated by publicly available evidence, which suggests that Turkey does not provide an adequate forum for the adjudication of human rights violations,

---

[17] As established in § III B, *supra*, Defendants do not argue for FNC dismissal of Plaintiffs' U.S.-based claims; Defendants simply ignore them and focus solely on the ATS/TVPA claims.

and that cases involving violations of human rights in Turkey are frequently adjudicated outside

the country.  According to the State Department's most recent human rights report, Turkey

continues to have serious human rights problems, including "unlawful killings," "torture,

beatings, and other abuses of persons by security forces," "arbitrary detention" and "impunity and

corruption."  U.S. State Dept., *Turkey- Country Report on Human Rights Practices-2005* (March

8, 2006) at 1 (hereinafter "State Dept. Report").[18]  Consistent with the allegations in Plaintiffs'

Complaint, the State Department reports that "[p]olice harassed, beat and abused demonstrators,"

and even killed demonstrators in some instances.  *Id.* at 4, 10-11.

The State Department also concluded that "the judiciary was sometimes subject to outside

influence" and that "[t]here were allegations of judicial corruption."  *Id.* at 6.  In particular, the

State Department emphasized that "[a]dministrative and bureaucratic barriers impeded

prosecutions and contributed to the low number of convictions of security personnel for human

rights abuses."  *Id.*  In addition, there is "no jury system" in Turkey.  *Id.*  Rather, "a judge or a

panel of judges decides all cases."  *Id.*  Also, "[p]roceedings against security officials often were

delayed because officers did not submit statements promptly or attend trials.  In some cases, such

delays extended beyond the statute of limitations, causing the trial to end without a verdict."  *Id.*

Moreover, while Turkish law officially forbids the use of evidence obtained by torture, "in

---

[18] Excerpts of the State Dept. Report are attached hereto as Exhibit B. This Court can take judicial notice of State Department reports. *See Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143 (2d Cir. 2000).

practice a trial based on a confession allegedly coerced under torture could proceed, and even

conclude, before the court had examined the merits." *Id.* at 7.[19]

In response to this volume of evidence, Defendants submit expert testimony that purports

to show that Turkey's law and courts are adequate to hear Plaintiffs' claims. *See* Declaration of

Ergun Ozsunay, Ph.D., dated March 24, 2006 (Dkt. 19) ("Ozsunay Decl."); Declaration of

Koksal Bayraktar, Ph.D., dated March 24, 2006 (Dkt. 26) ("Bayraktar Decl."); Declaration of

Nursen Caniklioglu, Ph.D., dated March 24, 2006 ("Caniklioglu Decl."). However, Defendants'

experts fail to addresses the ultimate question of whether Plaintiffs would be able to bring their

human rights claims against Defendants in Turkey as a practical matter; fail to address the level

of impunity which still exists in Turkish courts with regards to cases involving the police; and

completely ignore that many of Plaintiffs' claims are based on Coca-Cola's conduct in the U.S.,

which could not be heard before a Turkish Court.

---

[19] Numerous other sources support the State Department's assessment. For example, Human Rights Watch recently reported that, "[i]n the past year, Turkish police have repeatedly used disproportionate and lethal force to break up demonstrations that turn violent." Human Rights Watch, *Turkey: Police Killings Follow Attack on Bookstore* (Nov. 18, 2005), available *at* http://hrw.org/english/docs/2005/11/18/turkey12064_txt.htm. Although Turkish officials routinely assert that such incidents are fully investigated, "[t]he Turkish judiciary has an appalling record in investigating security force abuses. The European Court of Human Rights has also noted in scores of judgments that prosecutors are reluctant to indict or even question members of the security forces." *Id. See also* Amnesty International, *Turkey: No Impunity for State Officials Who Violate Human Rights* (May 2006), available *at* http://www.amnestyusa.org/countries/turkey/ document.do?id=ENGEUR440062006 (stating "Turkey has repeatedly been found in violation of the European Convention for the Protection of Human Rights and Fundamental Freedoms by the European Court of Human Rights for failure to carry out effective investigations of violations allegedly perpetrated by members of the security forces"). The European Commission, which closely monitors Turkey's progress on human rights, also found that while Turkey has implemented significant reforms in recent years with an eye toward joining the European Union, "the situation is uneven and torture cases persist." European Commission, *2003 Regular Report on Turkey's Progress Toward Accession*, ¶ 1.3, available *at* http://ec.europa.eu/comm/enlargement/report_2003/pdf/ rr_tk_final.pdf.

Specifically, one of Defendants' experts testifies only that Plaintiffs may be able to make an administrative claim against the Turkish State for police misconduct, *see* Ozsunay Decl. ¶¶ 23-27, or a civil tort claim against individual police officers or private defendants who "actively worked with the police or guided and encouraged their actions . . . and caused harm through their participation" in the brutal attack on Plaintiffs. *See id.* ¶¶ 28-31, 36-39, 45. While this testimony suggests in a general way that Plaintiffs may be able to bring *some* of their tort claims against Defendants in a Turkish court, the ones that do not focus primarily on Coca-Cola's U.S. conduct, it does not address whether Turkish law and courts recognize claims for violations of international human rights torts and would allow Coca-Cola itself to be tried for its role in theses human rights crimes. *See Talisman*, 244 F. Supp.2d at 337 (holding that even if a plaintiff's case could be re-fashioned as various civil claims in the foreign jurisdiction, they would necessarily render the remedy "insufficient," as an ordinary civil claim fails to "reflect the gravity of the alleged offenses, and in particular, the universally condemned nature of these acts"). *See also Tachiona*, 234 F. Supp. 2d at 416-17 ("To be sure, some aspects of international offenses may share elements with the ordinary municipal law torts. But, in practice, the acute form of misconduct entailed in international violations in many cases amounts to more than mere differences in degree, and assumes differences in kind so fundamental as to compel distinct treatment under universally recognized rules.") (citing *Filartiga v. Pena-Irala*, 630 F.2d 876, 890 (2d Cir. 1980)). Thus, the expert's conclusory opinion that "Turkish courts provide a fair legal system for redressing claims asserted by private parties," Ozsunay Decl. ¶ 18, which he supports by citing a handful of ordinary tort cases in which Turkish courts decided against the State, *see id.* ¶ 21, is legally insufficient to satisfy Defendants' burden that, as a practical matter, Plaintiffs

would receive a fair and impartial hearing (or any hearing at all) on their human rights claims in Turkey.[20]  *See In re Bridgestone/Firestone, Inc.*, 190 F. Supp. 2d 1125, 1132 n.6 (S.D. Ind. 2002)(conclusory expert opinions insufficient to meet defendants' burden of showing adequacy).

The testimony of Defendants' other two experts is even less relevant to this case. Defendants' second expert claims that Plaintiffs may be able to press *criminal* charges against the Turkish police or any "private citizen" – which apparently refers to an individual, not a corporate defendant, who aided and abetted the brutal attack on Plaintiffs.  *See* Bayraktar Decl. ¶¶ 32-42, 60-61.  This obviously does not address whether a *civil* action can be brought against the U.S. corporate Defendants, Coca-Cola and Coke Export.  Defendants' third expert states only that Turkish labor law and courts are adequate to hear any labor or employment claims that Plaintiffs may wish to bring against their former employers.  *See generally* Caniklioglu Decl.  In fact, this local labor law violation against the local employer was the only claim that could have been brought, and it was.  Compl. ¶ 90.  The experts' reiteration of this fact has no bearing at all on Plaintiffs' assertion that they cannot bring claims against the U.S. Defendants for their participation and/or complicity in the violence.

In light of Plaintiffs' well-pleaded allegations and the evidence set forth above, Defendants have not met their burden of establishing that Turkey would provide an adequate, alternative forum for the adjudication of all of Plaintiffs' claims.

---

[20] Defendants are also unable to rely on decisions that have held that Turkey is an adequate forum in ordinary commercial or tort actions because FNC requires a fact-specific inquiry, and those cases cited by Defendants have no applicability here.  *See In re Bridgestone/Firestone, Inc.*, 190 F. Supp. 2d 1125, 1132 n.6 (S.D. Ind. 2002)("Given the highly fact specific nature of the [FNC] inquiry, the courts in the cases cited by [defendant] could no more conclude that Venezuela is an adequate forum for all time in all cases than we could find that Venezuela is *not* an adequate forum for all time in all cases.").

**F.      Plaintiffs Should Be Afforded An Opportunity to Depose Defendants' Foreign Law Experts.**

Even if this Court were to find that the showing made by Defendants' foreign law experts on the general adequacy of Turkey as a forum is relevant to Plaintiffs' specific human rights claims, it would be premature to make a final decision prior to affording Plaintiffs the opportunity to depose such experts. *See, e.g.*, *Silberman v. Innovation Luggage, Inc.*, 2002 WL 31175226 *2 (S.D.N.Y. Sept. 30, 2002) ("A party is entitled to discovery regarding its adversary's foreign law expert, just as it is entitled to discovery regarding any other kind of expert.") (citing *In re Bridgestone/Firestone,* 131 F. Supp.2d 1027, 1031 (S.D. Ind. 2001) (which allowed deposition of foreign law experts, stating "when ruling on a motion to dismiss for *forum non conveniens*, the Court conducts a fact-based inquiry. . . . Therefore, it behooves courts to permit discovery on facts relevant to *forum non conveniens* motions")). *See also Base Metal Trading S.A. v. Russian Aluminum*, 2002 WL 987257 (S.D.N.Y. May 14, 2002) ("Plaintiffs should be permitted to investigate the bases for the opinions of the Defendants' foreign law experts through depositions before being required to submit their opposition papers."); *Norex Petroleum Ltd. v. Access Industries, Inc.*, 2003 WL 1484269, at *3 (S.D.N.Y. Mar. 23, 2003) ("the Court finds that some utility exists in permitting [plaintiff] to depose the experts who have submitted affidavits. . . that address the adequacy of the Russian forum and issues of Russian law").

Here, as discussed in the preceding section, Defendants' experts have made several general legal contentions that do not apply to Plaintiffs' specific legal claims, and it is not possible to offer rebuttal experts until it is clear what Defendants' experts claim is the basis for

believing that Plaintiffs could in fact sue Coca-Cola and Coke Export in Turkey for their specific

role in the human rights violations. Further, Defendants' experts have nothing at all to say about

the practical issues as to, regardless of the written laws, how Plaintiffs could obtain relief from

these powerful multinational firms in Turkish courts.

The fact is that absolutely no case has ever been brought in Turkey like the instant case

that seeks to hold the parent multinationals liable for human rights violations of their agents

and/or co-venturers, or that seeks to hold the parent companies liable for aiding and abetting

human rights violations. There is a reason for this – it can't be done in Turkey. Plaintiffs should

not be put to the burden of trail-blazing a new legal path that is most likely impossible to create,

and the FNC standard, with the burden on Defendants, does not require this. At any rate,

Defendants have failed to meet their burden of showing that Plaintiffs could bring all of their

claims in Turkey, and if there is even a question about this, Plaintiffs are entitled to obtain further

specific information about the experts' legal speculation through deposition.[21]  While Plaintiffs,

in the interest of judicial efficiency, have moved forward in responding to Defendants' FNC

motion because of their strong position that Defendants cannot, as a matter of law, prevail on the

FNC issue, it does not alter their procedural right to depose Defendants' experts, and once their

---

[21] In addition, one of Defendants' experts states an opinion on the ultimate facts underlying the merits of Plaintiffs' claims and the legal conclusions that this Court should draw therefrom.  *See* Bayraktar Decl. at ¶¶ 50-59, 73 (stating opinion on lawfulness of CCI's and the Cevik Kuvvet's conduct).  These portions of Defendants' expert testimony have no bearing on the adequacy of Turkey as an alternative forum or on any other issue relevant to Defendants' motion to dismiss, and Plaintiffs request that the Court disregard them as irrelevant and prejudicial to the Court's decision of that motion.  *See, e.g., In re Sprint Corp. Secs. Litig.*, 232 F. Supp. 2d 1193, 1212 (D. Kan. 2002) (refusing to consider, on motion to dismiss, defendants' expert testimony contravening allegations of complaint, because in deciding such motions "the court will merely accept as true all well-pleaded facts in the Complaint").

position is clarified, submit opposing expert opinion. *See, e.g., Jacobs v. Felix Bloch Erben*, 160

F. Supp.2d 722, 725 (S.D.N.Y. 2001) (allowing limited document discovery and depositions

regarding defendants' motion to dismiss based on FNC and lack of personal jurisdiction after

completion of briefing and oral argument before the court).

**G.     The Balance of Factors Weighs in Favor of Litigation in the U.S.**

Defendants' failure to meet their burden of proving that Turkey is an adequate and

available forum precludes this Court from reaching the second part of the *FNC* inquiry, which

requires a balancing of public and private interest factors. *See Mujica v. Occidental Petro.*

*Corp.*, 381 F. Supp. 2d 1134, 1148 (C.D. Cal. 2005); *Parex Bank v. Russian Savings Bank*, 116

F. Supp. 2d 415, 427 (S.D.N.Y. 2000).  Nevertheless, should the Court undertake this analysis,

*FNC* dismissal is only appropriate if Defendants meet their burden of showing that the balance of

public and private factors strongly favors transferring this case to Turkey. *See, e.g., Iragorri*, 274

F.3d at 74-75; *accord Wiwa*, 226 F.3d at 100; *Talisman*, 244 F. Supp.2d at 335.  In this case, the

balance of factors favors litigation in this Court given the strong U.S. policy in favor of litigating

Plaintiffs' ATS/TVPA claims in this Court, as well as the other claims based on U.S. conduct.

**1.     Public Interest Factors**

The strong U.S. policy interest in adjudicating Plaintiffs' claims in this Court tips the

balance of public interest factors decisively in Plaintiffs' favor, and none of Defendants'

objections meets their burden of overcoming this strong interest.  In addition to the United

States' interest in hearing ATS/TVPA claims recognized by the Second Circuit in *Wiwa*, 226

F.3d at 106-08, the United States also has a strong interest in adjudicating this case because of

34

Plaintiffs' allegations of corporate misconduct connected to the United States. *See* Section III

(B), *supra*. *See also Adamu*, 399 F. Supp. 2d at 505; *Exxon Mobil*, 2006 WL 516744, at *2.

None of the factors cited by Defendants meet their burden of overcoming the strong

public policy interests in this case. Although courts have a general interest in avoiding docket

congestion and preventing the unnecessary imposition of jury duty on New Yorkers, Defendants

have not articulated any way in which that interest is implicated with particular force in this case,

and this interest certainly cannot outweigh the strong public policy interest in adjudicating in this

Court ATS/TVPA claims or claims based on the U.S. conduct of U.S. corporations affecting U.S.

consumers.

Moreover, *Bigio v. Coca-Cola*, on which Defendants rely heavily for this argument, was

recently overturned by the Second Circuit on appeal. *See Bigio v. Coca-Cola*, 2005 WL 287397

(S.D.N.Y. Feb. 3, 2005), *rev'd*, 2006 WL 12367689 (2d Cir. May 9, 2006).

### 2.      Private Interest Factors

The balance of private interest factors also favors litigation in this Court. Relevant

private interests include: "'the ease of access to sources of proof, availability of compulsory

process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; . .

. and all other practical problems that make trial of a case easy, expeditious and inexpensive.'"

*Cabiri v. Assasie-Gyimah*, 921 F. Supp. 1189, 1199 (S.D.N.Y. 1996)(quoting *Gulf Oil Corp. v.*

*Gilbert*, 330 U.S. 501, 508 (1947)).

Defendants assert that the sources of proof in this case are entirely in Turkey, but this is

simply not true. At least with respect to Plaintiffs' allegations of Coca-Cola's U.S. conduct, the

key documents are  within Coca-Cola's custody or control within the United States, and "[t]he

35

key witnesses . . . either reside in the United States . . . or are readily producible here; and to the extent there are witnesses abroad who are beyond the court's subpoena power, their testimony can be provided by depositions taken pursuant to letters rogatory." *Bigio*, 2006 WL 1236789, at *3. *See also Manu Int'l S.A. v. Avon Prods., Inc.*, 641 F.2d 62, 68 (2d Cir. 1981) (noting that cost-shifting, not *FNC* dismissal, is the appropriate way to deal with any unfair discovery burdens created by a plaintiff's choice of a U.S. forum). Although Plaintiffs reside in Turkey, they are willing witnesses, and "the time and expense of obtaining the presence or testimony of a foreign witness in a local forum are significantly lessened by modes of communication and travel that are commonplace today." *Lehman v. Cayman, Ltd.*, 713 F.2d 339, 343 (8th Cir. 1983); *accord Manu Int'l*, 641 F.2d at 65; *Bodner v. Banque Paribas,* 114 F. Supp. 2d 117, 133 (E.D.N.Y. 2000). Further, Plaintiffs are willing to produce evidence of their damages, such as their medical records, in the United States. If anything, this makes the United States a more convenient forum for Coca-Cola and Coca-Cola Export, which would otherwise have to go to Turkey to get this evidence. *See Bridgestone*, 190 F. Supp. 2d at 1140.[22]

In addition, in weighing the balance of private interest factors, this Court should consider "the relative means of the parties." *Talisman*, 244 F. Supp. 2d at 341. This consideration overwhelmingly favors Plaintiffs. Although Defendants state a number of objections to adjudication of this case in New York, Defendants have not demonstrated that these costs are

---

[22] Defendants' other objections, such as their assertion of a supposed need to view the premises in Turkey where Plaintiffs were injured, are overblown. Aside from an occasional television drama, it is the rare case that requires, let alone permits, a jury to view the "scene of the crime," and Defendants do not even address why this might be necessary to the case. *See Mujica*, 381 F. Supp. 2d at 1152 ("[T]he Court is skeptical that a jury would need to view the scene . . . to decide the case.").

excessively burdensome, especially in view of Defendants' vast resources. *See Wiwa*, 226 F.3d at

107 (noting "[i]t will often be quicker and less expensive to transfer a witness or a document

than to transfer a lawsuit"); *accord Talisman*, 244 F. Supp. 2d at 341; *Rudetsky v. Dowd*, 660 F.

Supp. 341, 347 (E.D.N.Y. 1987).[23]  Defendants have conclusively demonstrated this by bringing

managers from all over the world to New York to try to convince local universities of their side

of the union violence story.  Compl. ¶ 98.  Further, as recognized by the *Wiwa* Court, the

additional cost and inconvenience to Defendants of litigating in New York is fully

counterbalanced by the cost and inconvenience to Plaintiffs of requiring them to reinstate the

litigation in Turkey, especially given Plaintiffs' minimal resources in comparison to the vast

resources of Defendants. *See Wiwa*, 226 F.3d at 107.

     Plaintiffs here have also "already obtained . . . pro bono counsel to litigate this matter in

the courts of the United States; there is no guarantee that they will be able to obtain equivalent

representation in [Turkey] without incurring substantial expenses." *Id.* at 108 n.13; *accord*

*Talisman*, 244 F. Supp. 2d at 341. *See also Iragorri*, 274 F.3d at 72 (finding that uncertainty as to

"availability of appropriate legal assistance" in alternative forum weighed against dismissal).

Dismissal of this action would place a substantially greater burden on Plaintiffs, causing them to

forfeit the "substantial investments of time, money, and energy" that they have already made "in

pursuing this litigation in U.S. courts." *Wiwa*, 226 F.3d at 108 n.13.

---

[23] *See also Iragorri*, 274 F.3d at 74 ("In considering these [private interest] factors, the
court is necessarily engaged in a comparison between the hardships defendant would suffer
through the retention of jurisdiction and the hardships the plaintiff would suffer as the result of
dismissal and the obligation to bring suit in another country").

Defendants' argument that this case may require the Court to apply Turkish law is equally unavailing. First and foremost, Plaintiffs' ATS, TVPA, and RICO claims will require application of federal law, and Plaintiffs' common law tort claims that focus on Coca-Cola's U.S. conduct will require application of either New York law or the law of another state.[24] Second, even if Turkish law were to apply to some or all of Plaintiffs' other claims, U.S. courts identify and apply foreign law all of the time without encountering intractable problems. *See, e.g., Manu Int'l*, 641 F.2d at 68; *Rudetsky*, 660 F. Supp. at 348. Finally, "it is well-established that the need to apply foreign law is not alone sufficient to dismiss under the doctrine of forum non conveniens." *R. Maganlal & Co. v. M.G. Chem. Co., Inc.*, 942 F.2d 164, 169 (2d Cir. 1991); *Bigio*, 2006 WL 1236789, at \*2. Accordingly, Defendants' concerns about the possibility that Turkish law might apply to some of Plaintiffs' claims are insufficient to meet their burden.

**H.    There Is No International Comity Issue in This Case.**

Finally, contrary to the assertion of Defendants, there are no issues of international comity that prevent this Court from resolving the present action, particularly since it would be premature to consider this issue at the dismissal stage.[25] Comity is not obligatory, but rather a

---

[24] *See Globalnet Financial Com, Inc. v. Frank Crystal & Co., Inc.*, 2006 WL 1195923, \*6 (2d. Cir. May 5, 2006) (stating that New York utilizes the "interest analysis" for purposes of choice of law, meaning that courts should apply the law of the jurisdiction having the greatest interest in the litigation). Here, given that many of Plaintiffs' claims focus on Coca-Cola's conduct in the U.S., and the strong U.S. policy favoring adjudication of Plaintiffs' ATS/TVPA claims in the U.S., there is no question that U.S. law, and New York law in particular, applies.

[25] The doctrine of comity is a fact-intensive inquiry, requiring analysis of the foreign act in question and the interests of each government. It is "more appropriately addressed at the summary judgment stage" than in the context of a motion to dismiss, prior to any discovery, without a factual record before the Court. *Estate of Rodriquez v. Drummond Co., Inc.*, 256 F. Supp. 2d 1250, 1255 n. 2 (N.D. Ala. 2003). *See also Drexel Burnham Lambert Group, Inc. v. Galadari*, 777 F.2d 877, 881 (2d Cir. 1985) (holding that if there are disputes of material facts,

38

"fundamentally discretionary act" that should only be exercised with caution.  *Talisman*, 244 F. Supp. at 342 (citations omitted). *See also Bodner*, 114 F. Supp. 2d at 129.  For comity to apply, there generally must be a "true conflict between domestic and foreign law." *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 798 (1993). *See also Mujica*, 381 F. Supp. 2d at 1155-57. Finding such a conflict is a threshold matter, which must be fulfilled prior to moving on to any such additional steps as weighing the U.S. and foreign interests at stake. *In re Maxwell Comm. Corp.*, 93 F.3d 1049, 1050 (2d Cir. 1996); *In re Cinar Corp. Secs. Litig.*, 186 F. Supp. 2d 279, 291, 292  (E.D.N.Y. 2002).

Here, Defendants can point to no legislative acts or legal decisions that even might conflict with this Court's exercise of jurisdiction over this matter.[26] Comity simply is not implicated where there are no "parallel proceedings" in foreign courts or conflicting decrees from foreign governments. *See Bodner*, 114 F. Supp. 2d at 129.  Rather, the *only* proceedings were the local labor cases Plaintiffs brought for the wrongful termination, and these were resolved by a coerced settlement that leaves no pending cases in Turkey that could be in conflict with the instant case. *See* Compl. ¶ 90.  Not only were these limited proceedings not "parallel"– they did not involve any of the Defendants before this Court, and were not duplicative of Plaintiffs' claims here – but Defendants have failed to point to any conflict, or perceived conflict, between those proceedings and the maintenance of Plaintiffs' claims in *this* case. *See Hartford Fire Ins.*, 509 U.S. at 798.

---

which would allegedly provide a basis for comity, these should be decided on a motion for summary judgment).

[26] Nor does the mere fact that the actions of the Turkish police will be discussed in this trial a factor that requires the application of comity. *See, e.g., Talisman*, 244 F. Supp. 2d at 343.

Further, Defendants have failed to prove a key element of the comity doctrine – upon
which they have the burden of proof – *i.e.*, that there is an available and adequate forum, and that
a balance of the interests of the United States and Turkey would weigh in the favor of dismissing
this case. *See, e.g., In re Cinar Corp. Secs. Litig.*, 186 F. Supp. 2d at 291-92. Having failed to
meet their burden on these issues, *see* Sections III (A)-(E), *supra*, Defendants cannot prevail.

**I.      Plaintiffs Have Alleged Actionable Claims Under the ATS and TVPA For Torture.**

In addition to Defendants' *FNC* arguments, they have made several *pro forma* arguments
that Plaintiffs' ATS and TVPA claims for torture are not actionable. As Plaintiffs demonstrate
below, none of Defendants' assertions have merit. Claims for torture are not only routine under
the ATS, but specifically authorized by the TVPA.

In *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), the Supreme Court affirmed the
approach of dozens of federal courts, including the seminal Second Circuit case *Filartiga v.
Pena-Irala*, 630 F. 2d 876, 890 (2d Cir. 1980), that plaintiffs may pursue claims for violations of
international norms that are "specific, universal, and obligatory." 542 U.S. at 732. The Supreme
Court did not criticize a single case in which an international human rights norm had been
recognized, other than the arbitrary arrest claim at issue in *Sosa* itself. Based on the continued
application of the "specific, universal and obligatory standard" endorsed by the *Sosa* Court,
torture is universally acknowledged to be a violation of "the law of nations." Indeed, as noted
previously, the *Sosa* Court specifically cited the *Filartiga* decision, which recognized torture as a
violation of international law, as well as *In re Estate of Marcos Human Rights Litigation*, 25
F.3d 1467 (9th Cir. 1994) and the Restatement (Third) of Foreign Relations Law, both of which
also identify torture as an actionable norm. 542 U.S. at 737.

Defendants cannot dispute that torture is an actionable international norm, but must establish, in the context of a motion to dismiss, that Plaintiffs' particular allegations are insufficient to constitute torture.[27] This is legally impossible.

### 1.    The Brutality Experienced By Plaintiffs Is Torture.

To constitute torture, the TVPA requires that the act be "directed against an individual in the offender's custody or physical control by which severe pain or suffering . . . whether physical or mental, is intentionally inflicted on that individual for such purposes as . . . intimidating or coercing that individual . . ." 28 U.S.C. § 1350, *note* § 3(b)(1)(emphasis added).

Applying this definition, there is no question that Plaintiffs have alleged sufficient facts to constitute torture.  They allege that, in the course of their peaceful protest in front of CCI offices, local Coca-Cola managers caused the Çevik Kuvvet, a notorious branch of the Turkey police, to violently attack them. Compl. ¶ 32. The Çevik Kuvvet sprayed them with tear gas, made particularly lethal due to its use in the enclosed space occupied by Plaintiffs, repeatedly beat them with clubs, and when they could no longer move, paralyzed by the tear gas and clubbing,

---

[27] Defendants also argue that the ATS and TVPA are "mutually exclusive" and that therefore Plaintiffs cannot bring torture claims simultaneously under both statutes.  Coca-Cola Br. at 30.  Contrary to Defendants' assertion, Congress did not pass the TVPA to displace the ATS with respect to torture.  *See Hilao v. Estate of Marcos*, 103 F.3d 767, 778-79 (9th Cir. 1996); *Kadic v. Karadzic*, 70 F.3d 232, 241 (2d Cir. 1995); *Abebe-Jira v. Negewo*, 72 F.3d 844, 848 (11th Cir. 1996); *Doe v. Islamic Salvation Front*, 993 F. Supp. 3, 7-9 (D.D.C. 1998).  If Congress had intended to repeal torture claims under the ATS by passing the TVPA, it would have done so in a manner both "clear and manifest; otherwise . . . the [TVPA] is to be construed as a continuation of and not a substitute for the first act." *See Posada v. Nat'l City Bank of New York*, 296 U.S. 497, 503 (1932). *See also Branch v. Smith*, 538 U.S. 254, 273 (2003) (absent clearly expressed congressional intention . . . repeals by implication are not favored.") (internal citations omitted); *Aldana v. Del Monte Fresh Produce, Inc.*, 416 F.3d 1242, 1251 (11th Cir. 2005)("an intent to amend the ATS is not apparent from the face of the statute and amendments by implication are disfavored.").

the police continued to kick them and then dragged them to confined police vans, where they were forced to endure yet another dose of toxic tear gassing. *Id.* ¶¶ 34, 35.  Once on the truck, they were taken to a jail cell with no windows, which increased severely the toxic effect of the tear gas. *Id.* ¶ 36.  They were then detained for a period of approximately 10 hours agonizing over the uncertainty of whether they would be again beaten or killed and knowing that their family members were also being tortured. *Id.* ¶¶ 39-88.

As a result, Plaintiffs alleged they suffered extreme physical pain and mental suffering believing they were being beaten to death. *Id.*  Plaintiffs' injuries were so severe that many need stitches and hospitalization, particularly due to injuries to the head and eyes and the toxic effects of tear gas fumes. *Id.*  These factual allegations are certainly sufficient to state a claim under international law. Indeed, a recent Eleventh Circuit decision, mis-cited by Defendants, *Aldana v. Del Monte Fresh Produce, Inc.*, 416 F.3d 1242, 1251-52 (11th Cir. 2005), clearly recognizes violent attacks against trade unionists as torture, when they are part of a systematic campaign of terror designed deliberately to cause mental and physical suffering to coerce the leaders to abandon their union.[28]

Further, Defendants' arguments are based solely on comparison of Plaintiffs' injuries to that of purportedly more egregious cases, which is fundamentally improper – the "actionability of one plaintiff's claims cannot depend on the degree of evil perpetrated on another plaintiff."

---

[28] Defendants cite the *Aldana* case as finding an eight hour detention by armed security forces insufficient to state a claim. *See* Coca-Cola Br. at 32.  However, Defendants neglect to mention that, while the detention was insufficient for an arbitrary detention claim, the court found that threats of death, without more, when intended to coerce the union members to abandon their right to form a union, were sufficient to constitute torture. *Aldana*, 416 F.3d at 1251-52.

*Eastman Kodak Co. v. Kavlin*, 978 F. Supp. 1078, 1094 (S.D. Fla. 1997).  Rather, "the court

must assess the intensity, duration and heinousness of the agony" inflicted in the particular case,

which is necessarily a factual inquiry.  *Doe v. Qi,* 349 F. Supp.2d 1258, 1317 (N.D. Cal. 2004)

(holding sustained systematic beatings or use of particularly heinous acts such as. . . weapons or

methods designed to inflict agony does constitute torture).

### 2.   The torture inflicted on Plaintiffs was not incidental to "lawful sanctions," and in any event, this issue turns on a question of fact appropriate for trial.

Finally, Defendants' argument that the violence inflicted on Plaintiffs was "incidental to

lawful sanction," and is therefore not actionable as torture, is without merit.  Plaintiffs allege that

the action of the Çevik Kuvvet was taken at the direction of a private entity, Coca-Cola, acting

through CCI. Compl. ¶¶ 32, 34.  Moreover, the universal consensus against torture requires the

conclusion that the Çevik Kuvvet's actions were not conducted in the public good, and therefore

cannot be considered incidental to "lawful sanctions".[29]  The implementing regulations to the

Convention Against Torture make this quite clear defining lawful sanctions as "judicially

imposed sanctions and other enforcement actions authorized by law . . . but do not include

sanctions that defeat the object and purpose of . . . prohibit[ing] torture".  8 C.F.R. § 208.18 (3).

Here, the Çevik Kuvvet were certainly not acting pursuant to judicially imposed sanctions, but

rather as a specific means of punishment and intimidation based on Plaintiffs' union status.

Indeed, any legitimate argument that could be made to support the idea of lawful sanctions is

---

[29] Notably, this does not destroy Plaintiffs' allegations of state action.  Both the TVPA and the ATS incorporate the "under color of law" jurisprudence of 42 U.S.C. § 1983 into the state action inquiry.  *See, e.g.*, *Kadic*, 70 F.3d at 245.  Under that standard, a state official can conduct ultra vires acts but nonetheless be a state actor because he or she was acting in abuse of his or her official position.  *Monroe v. Pape*, 365 U.S. 167, 172-87 (1961); *accord Velez v. Levy*, 401 F.3d 75, 84 (2d Cir. 2005).

erased by the repeated, and unnecessary beating and toxic spraying of Plaintiffs when they were already incapacitated. Compl. ¶¶ 38-90.  In any event, whether the police force acted at the bequest of Coca-Cola as a private party, and whether the violence inflicted on plaintiffs was "incidental to lawful sanction," are questions of fact, not resolvable on a motion to dismiss.  *See, e.g.*, *Price v. Socialist People's Libyan Arab Jamahiriya*, 274 F. Supp. 2d 20, 25 (D.C. Cir. 2003) (holding that allegations regarding "conflicting versions of the physical treatment to which plaintiffs were subjected would be more properly dealt with during a trial on the merits than in a dismissal motion").

### 3.    Corporations Can Be Sued As "Individuals" Under the TVPA.

Defendants also seek to avoid liability under the TVPA by asserting that only human "individuals," but not corporate entities, can be sued under the TVPA.  While the operative term in the TVPA is "individual", there is nothing in the structure or history of the TVPA that suggests that Congress intended to exclude corporations from liability for torture or extra-judicial killings under the statute.  To the contrary, as we demonstrate below, Congress expressed a clear intent for the TVPA to be construed as broadly as possible to allow for the vindication of a broad range of human rights violations committed by a broad range of potential wrongdoers.  Further, the weight of authority indicates that under the TVPA, the more expansive definition of "individual" is the appropriate definition, and that "individual" is equivalent to "person," which includes private corporations.

The TVPA by its terms imposes liability on an "individual" who subjects others to torture or extrajudicial killing.  The plain meaning of the word "individual" has, for decades, been used to refer both to natural as well as artificial persons, such as corporations, and there is no express

44

limitation in the language of TVPA that corporations are to be excluded.  Rather, as Black's Law

Dictionary explains, while this term "commonly" denotes "a private or natural person," "it is said

that this restrictive signification is not necessarily inherent in the word, and that it may, in proper

cases, include artificial persons." Black's Law Dictionary, 4th & 6th Editions.[30]  Indeed, courts

relying upon Black's, have concluded that the "'individual' as a general legal term does not

exclude corporations." *See, e.g., U.S. v. Middleton*, 231 F.3d 1207, 1210 (9th Cir. 2000).

The Supreme Court, in *Clinton v. New York*, 524 U.S. 417 (1998), also examined the

meaning of "individual," and found it synonymous with "person", which would encompass a

corporation.  There, the question was whether the term "individual" in the Line Item Veto Act

allowed a corporation to challenge the President's authority to cancel provisions in federal

statutes.  The Supreme Court held that "Congress undoubtedly intended the word 'individual' to

be construed as synonymous with the word 'person'" although the Line Item Veto Act allows

"any *individual* adversely affected by [the Act] to bring an action." *Id.* at 428 (emphasis added).

*See also U.S. v. Blinder*, 10 F.3d 1468, 1473 (9th Cir. 1993) (finding that the term "group of

individuals" encompassed "a group of corporations," and thus, that a group of corporations could

constitute a criminal "enterprise" under RICO) (citing *U.S. v. Feldman*, 853 F.2d 648 (9th Cir.

1988), *cert. denied*, 489 U.S. 1030 (1989)); *Metropolitan Life Ins. Co. v. Ward*, 470 U.S. 869,

---

[30] The 4th Edition of Black's Law Dictionary (at 913) refers the reader to *State of Ohio v. Bell Telephone Co.*, 36 Ohio St. 296, 310 (1880), in which the Supreme Court of Ohio interpreted the word "individual" in a statute to be synonymous with "person" and thus to "embrace[] artificial or corporate persons as well as natural."  The 6th Edition (at 773), which is the last edition to contain the definition of the noun "individual" (as contrasted with the adjective) simply refers the reader to "person," a term which, under the law, normally refers to corporations as well as natural persons.

881 (1985); *U.S. v. Turkette*, 452 U.S. 576, 583 (1981) (using the term "individual" and

"persons" interchangeably); *accord U.S. v. Cooper*, 91 F. Supp. 2d 60 (D.D.C. 2000); *U.S. v.*

*Aimone*, 715 F.2d 822 (3d Cir. 1983); *U.S. v. Thevis*, 665 F.2d 616 (5th Cir. 1982) (same).

  With respect to interpretations of the term "individual" under the TVPA itself, the sole

appellate court to face this issue to date, the Fifth Circuit, declined to decide the question but

explicitly refused to affirm the lower court's holding that the term "individual" as used in the

TVPA does not include corporations. *See Beanal v. Freeport-McMoran, Inc.*, 197 F.3d 161, 169

(5th Cir. 1999). Further, even the district court in *Beanal* acknowledged that the legislative

history of the TVPA stated only that "Congress purposefully chose the term ["individual"] so as

to circumscribe foreign state liability under the Act," and that "Congress does not appear to have

had the intent to exclude private corporations from liability under the TVPA."*Beanal v.*

*Freeport-McMoran, Inc.*, 969 F. Supp. 362, 382 (E.D. La. 1997). The district court's conclusion

that corporations cannot be sued under the TVPA was therefore contrary to its own conclusion

regarding the legislative history.

  Since the *Beanal* decision, two courts have held that corporations are within the scope of

"individual" under the TVPA. *See Drummond*, 256 F. Supp. 2d at 1266-1267 and

*SINALTRAINAL v. Coca-Cola Co.*, 256 F. Supp.2d 1345, 1358-59 (S.D. Fla. 2003)(both holding

that the TVPA's legislative history in no way demonstrates an intent to exclude private

corporations from the definition of "individual"). While other courts have found the opposite,[31]

---

[31] *See, e.g., Doe v. Exxon Mobil Corp*, 393 F. Supp. 2d 20, 28 (D.D.C. 2005); *In re Agent Orange Product Liability Litig.*, 373 F. Supp. 2d 7, 55-56 (E.D.N.Y. 2005); *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 828 (S.D.N.Y. 2005); *Arndt v. UBS AG,* 342 F. Supp. 2d 132, 141 (E.D.N.Y. 2004). *Mujica v. Occidental Petro. Corp.*, 381 F. Supp. 2d 1164, 1175-76 (C.D. Cal. 2005), also cited by Defendants, is currently before the Ninth Circuit

46

they did so with no clear authority and, as shown below, in direct conflict with the TVPA's legislative history.

The TVPA's legislative history does not indicate any specific intent to exclude corporations from the definition of "individual." Indeed, the issue of corporate liability was never discussed. Surely such a radical limitation would have warranted discussion. Rather, the only reference to the term "individual" is in the context of stating that foreign states or their entities cannot be sued under this bill under any circumstances.[32] This clearly shows that the Senate was concerned with sovereign immunity issues, rather than shielding corporations from liability. Otherwise, the legislative history demonstrates that the Senate and House Reports use the words "person" and "individual" interchangeably. For example, Senator Specter, the sponsor of the Senate bill, stated that "[t]he bill is limited to suits against *persons* who specifically ordered, abetted, or assisted in the torture."[33] Similarly, in discussing the TVPA liability of higher officials, the Senate Report explains that "[u]nder international law, responsibility for torture, summary execution, or disappearances extends beyond the *person or persons* who actually committed those acts."[34] To shield a corporation, but not a human, perpetrator from liability would leave some victims without recourse and would surely be an "absurd and unjust

---

on appeal.

[32] S. Rep. No. 102-249, at *7.

[33] 137 Cong. Rec. S1369-01, 1991 WL 9635, at *1378 (emphasis added). *See also* TVPA, 28 U.S.C. § 1350, *note* 2(a)(2)(stating damages for extrajudicial killing may be paid to "the *individual's* legal representative, or to any *person* who may be a claimant in an action for wrongful death") (emphasis added).

[34] S. Rep. No. 102-249, at *9 (emphasis added)

47

result," one for which "there is no plausible reason," and one which "Congress could not have intended." *Cf. Clinton*, 524 U.S. at 429.

Therefore, given that Congress expressed no intent to immunize private corporations from liability, and its clear intent to have the TVPA applied as broadly as possible to reach a broad range of human rights abusers, this Court should construe "individual" in its broader sense to include corporations. Such an application would be further consistent with decisions in this Circuit that the term "individual" can include corporations.[35]

### 4. Plaintiffs Have Exhausted Available Remedies in Turkey.

Defendants ignore applicable law and assert incorrectly that Plaintiffs are required to establish that they exhausted local remedies prior to bringing a TVPA claim.  Coca-Cola Br. at 45.  The legislative history of the TVPA expressly states that Plaintiffs are under no obligation to demonstrate exhaustion where the forum cannot provide adequate and available remedies such that an attempt to exhaust local remedies would be futile.  The legislative history of the TVPA makes this point quite clear:

> torture victims bring suits in the United States against their alleged torturers only as a last resort. . . . **Therefore, as a general matter, . . . initiation of litigation under this legislation will be virtually prima facie evidence that the claimant has exhausted  his or her remedies in the jurisdiction in which the torture occurred.** The committee believes that courts should approach cases brought under the proposed legislation with this assumption. More specifically, . . . [t]he ultimate burden of proof and persuasion on the issue of exhaustion of remedies, . . . lies with the defendant.

---

[35] However, if this Court concludes that corporations cannot be sued under the TVPA, Plaintiffs will seek leave to amend their Complaint to name as individual Defendants the officers of the Defendant corporations responsible for the atrocities committed against them.

S. Rep. No. 102-249, at * 9-10 (emphasis added). *See also SINALTRAINAL*, 256 F. Supp.2d at

1357-58; *Drummond*, 256 F. Supp.2d at 1267-68; *Wiwa*, 2002 WL 319887, at *17-18

("defendants, not plaintiffs, bear the burden of demonstrating that plaintiffs have not exhausted

'alternative and adequate' remedies."); *Cabiri*, 921 F. Supp. at 1197, n.6; *Hilao,* 103 F.3d at 777-

78 (upholding District Court's refusal to issue jury instructions on the exhaustion of remedies

because Estate had "pointed to no evidence that it put forth even to raise the issue that [plaintiff]

had unexhausted remedies available elsewhere, let alone evidence sufficient to carry its burden").

Here, Defendants have not met their burden of establishing exhaustion as an affirmative

defense. As discussed in Section III (E), *supra*, in the context of *FNC*, Defendants did not

address whether Plaintiffs would be able to bring their international human rights claims before a

Turkish court, a judicial system which the U.S. State Dept., and numerous other commentators,

have documented is plagued with impunity when dealing with such violations. *See* State Dept.

Report at 1, 5. As the Court in *Talisman* noted, the inability to bring a tort action that fully

acknowledges the character of a human rights violation prohibited by international law itself

renders a particular remedy inadequate. *See, e.g.*, *Talisman*, 244 F. Supp.2d at 337; *Tachiona*,

234 F. Supp. 2d at 416-17. In this context, that Plaintiffs brought their local labor claims against

their local employer has nothing to do with whether they could get effective and adequate

remedies for their human rights claims against the U.S. corporate Defendants sued herein. *See*

Compl. ¶ 90.

5.      **Aiding and Abetting Is Available in Both ATS and TVPA Claims.**

Federal courts "have almost unanimously permitted actions premised on a theory of aiding and abetting" under the ATS. *Talisman*, 244 F. Supp. 2d at 321.  Nothing in *Sosa* addresses the issue of aiding and abetting liability or casts doubt on the long line of pre-*Sosa* cases finding such liability is available under the ATS.  *See, e.g., Doe I v. Unocal Corp.*, 395 F.3d 932, 955 (9th Cir. 2002); *Hilao,* 103 F.3d at 776; *Wiwa*, 226 F.3d at 105; *Filartiga,* 630 F.2d at 885.[36]  Again, Defendants ignore the significance of the *Sosa* Court's general approval of the manner in which pre-*Sosa* courts had decided ATS cases.

Since *Sosa,* the only two appellate court decisions the issue affirm that aiding and abetting liability exists under the ATS.  *See Estate of Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1157-58 (11th Cir. 2005); *Aldana,* 416 F.3d at 1248.[37]  Indeed, aiding and abetting liability was available from the very inception of the ATS.  *See Breach of Neutrality*, 1 Op. Att'y

---

[36] *See also Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 374 F. Supp. 2d 331, 338 (S.D.N.Y. 2005); *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765, 826 (S.D.N.Y. 2005); *In re Agent Orange Product Litigation*, 373 F. Supp. 2d 7, 37 (E.D.N.Y. 2005); *Doe v. Rafael Saravia*, 348 F. Supp. 2d 1112, 1148 (E.D. Cal. 2004); *Doe v. Qi*, 349 F. Supp. 2d at 1332; *Bowoto v. ChevronTexaco Corp.*, 312 F. Supp. 2d 1229, 1247 (N.D. Cal. 2004); *Burnett v. Al Baraka Investment*, 274 F. Supp. 2d 86, 100 (D.D.C. 2003); *Mehinovic v. Vuckovic*, 198 F. Supp. 2d 1322,  1355 -1356 (N.D.Ga. 2002); *Bodner*, 114 F. Supp. 2d at 128.

[37] There are three post-*Sosa* district court opinions which accept Defendants' argument. *See Exxon Mobil Corp.*, 393 F. Supp. 2d at 24 and *Corrie v. Caterpillar Inc.*, 403 F. Supp. 2d 1019, 1027 (W.D. Wash. 2005), *appeal pending* No. 36210, both of which merely follow the reasoning of *In re South Africa Apartheid Litigation*, 346 F. Supp. 2d 538 (S.D.N.Y. 2004). The *Apartheid* decision, which is on appeal and which was argued before the Second Circuit on January 24, 2006, has not even been followed by other district judges in the Second Circuit.  In *Talisman*, 374 F. Supp. 2d at 340-41, Judge Cote, after the *Sosa* decision, agreed with Judge Schwartz's prior analysis that the weight of international authority demonstrates that aiding and abetting liability for human rights violations is part of customary international law and is available as a theory of liability under the ATS.

Gen. 57, 59 (1795). There, Attorney General Bradford issued an official Opinion that plainly

states that ATS liability is available against aiders and abettors. *See Kadic*, 70 F.3d at 239

(Bradford Opinion refers to "acts of American citizens *aiding* the French fleet to plunder British

property") (emphasis added).  Notably, even the *Sosa* Court relied on the Bradford Opinion as

important evidence of the Founders' intent. *See* 542 U.S. at 721.[38]

Defendants' argument that the application of aiding and abetting is uncertain, particularly

in the civil context, is simply wrong. Aiding and abetting liability  has been recognized in

international law at least since Nuremberg, which provides that knowingly facilitating grave

abuses creates liability.[39]  Numerous other international treaties establish aiding and abetting

liability.[40]  Not surprisingly, the international community has sought to cast the broadest possible

---

[38] This understanding of the ATS is supported by other cases of the era. *See Talbot v. Janson*, 3 U.S. (3 Dall.) 133, 156-58, 167-168 (1795) (Talbot, a French citizen, who was found to have "abetted" Ballard, a U.S. citizen, in unlawfully capturing a Dutch ship, acted in contravention of the law of nations and was liable for the value of the captured assets); *Harmony v. United States (The Malek Adhel)*, 43 U.S. (2 How.) 210, 234-35 (1844) (recognizing that persons may be civilly liable even if they did not participate directly in the tortious acts); *The Amiable Nancy,* 16 U.S. (3 Wheat.) 546, 559 (1818) (same).

[39] *See United States v. Friedrich Flick*, 6 Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10, 1216-1223 (1952) civilian industrialist convicted "under settled legal principles" for contributing money to the Nazi regime when fully aware of its murderous activities); *In re Tesch*, 13 Int'l. L. Rep. 250 (Br. Mil. Ct. 1946) (industrialist convicted for supplying poison gas to a concentration camp, knowing its use); *United States v. Krauch*, 8 Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10, 1081, 1169-72 (1952) (pharmaceutical executives charged with sending experimental vaccines to the SS, knowing that SS would use them in tests on concentration camp inmates).

[40] *See, e.g.*, Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted* Dec. 10, 1984, *entered into force* June 26, 1987, G.A. Res. 39/46, 39 U.N. GAOR, No. 51, at 197, U.N. Doc. A/39/51 (1984) Arts. 1, 4, SPA314; Supplementary Convention on the Abolition of Slavery, the Slave Trade, Institutions and Practices Similar to Slavery, *entered into force* April 30, 1957, art. 6, 266 U.N.T.S. 3, 43

net in redressing human rights violations.  Yet, Defendants ask this Court to disregard these international authorities, arguing that their criminal context renders them irrelevant.  Coca-Cola Br. at 42 n.26.  However, this argument ignores that when a specific violation of international law is committed, aiding and abetting liability has been acknowledged as part of the common law for the corresponding tort in all relevant ATS cases.  Not only has this approach has been recognized as valid at least since the 1795 Bradford Opinion, the eighteenth-century paradigms recognized in *Sosa* were based on the international criminal law of that era.[41]

Finally, aiding and abetting liability is also commonplace in domestic tort law under a standard nearly identical to the international law standard.  *See Halberstam v. Welch*, 705 F.2d 472, 478 (D.C. Cir. 1983) (test for "aiding-abetting focuses on whether a defendant knowingly gave 'substantial assistance' to someone who performed wrongful conduct, not on whether the defendant agreed to join the wrongful conduct").  *See also* Restatement of Torts § 876(b) (person liable if he "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other").

_____

(establishing liability for "being an accessory" to enslavement); Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, *adopted* Dec. 19, 1988, 28 I.L.M. 493 (1989), art. 3 (establishing aiding and abetting liability), SPA326; Convention for the Suppression of Terrorist Bombings, *adopted* Jan. 9, 1998, G.A. Res. 52/164 (mandating that states criminalize the aiding and abetting of terrorist bombing), SPA416; International Convention for the Suppression of the Financing of Terrorism, *adopted* Dec. 9, 1999, G.A. Res. 54/109 (requiring states to criminalize aiding and abetting the willful provision or collection of funds with knowledge they will be used to carry out terrorist acts), SPA485.

[41] Indeed, the doctrine of command responsibility, which comes directly from international criminal law, further demonstrates that Defendants' criminal/civil distinction cannot be sustained.  *See, e.g.*, *In re Yamashita*, 327 U.S. 1 (1946).  Courts have applied the doctrine in numerous ATS cases, drawing on international criminal jurisprudence for the applicable standards.  *See Hilao*, 103 F.3d at 776-77.

It is likewise well-established that aiding and abetting liability is available under the TVPA, which expressly extends liability to anyone who "subjects" an individual to torture or extra-judicial killing. Under its dictionary definition, to "subject" means "'to cause to undergo or experience some action or treatment.'" *Mujica*, 381 F. Supp. 2d at 1173 (quoting Webster's New World Dictionary 1334 (3d ed. 1988)). The TVPA's legislative history also states unequivocally that the Act will permit "lawsuits against persons who ordered, *abetted or assisted* in the torture" or extrajudicial killing. *See* S. Rep. No. 102-249, at 8-9 (1991) (emphasis added). It is not surprising that virtually every court that has considered the question has concluded that the TVPA extends liability to aiders and abettors.[42] Indeed, Defendants cannot and do not account for why Congress would distinguish between ATS and TVPA claims on this issue, given the express congressional view that TVPA claims were complementary to ATS claims.

Defendants simply cannot overcome the great weight of authority and establish as a matter of law that aiding and abetting liability is not available in ATS and TVPA cases. There is no question that Plaintiffs have adequately alleged facts that would support aiding and abetting liability. *See, e.g.*, Compl. ¶¶ 91-100. At the pleading stage these facts must be taken as true, and regardless of Defendants' attempt to inappropriately dispute these facts, the reasonable inference is that Coca-Cola had to know and sanction the use of force and lethal tear gas on Plaintiffs. *See Hayden v. Pataki*, 2006 WL 1169674, *27 (2d Cir. May 4, 2006) (holding that in judging a motion on the pleadings a court "must accept the allegations in the complaint as true. . .".) At a minimum, Plaintiffs' allegations are sufficient to mandate discovery on the precise level

---

[42] *See, e.g.*, *Cabello*, 402 F.3d at 1157-58; *Rafael Saravia*, 348 F. Supp. 2d at 1148-49; *Wiwa*, 2002 WL 319887, at *15-16 (S.D.N.Y. Feb. 28, 2002) ; *Mehinovic*, 198 F. Supp. 2d at 1355-56.

53

of Coca-Cola's involvement. *See, e.g.*, *Burke v. Dowling*, 944 F. Supp. 1036, 1054-55 (E.D.N.Y.

1995) (holding plaintiffs are entitled to discovery on their claims so long as they have pleaded

some minimal factual basis which would entitle them to relief).

**J.      Plaintiffs Have Alleged an Actionable Claim for CIDTP Under the ATS.**

As indicated previously, the *Sosa* Court affirmed the approach of numerous federal courts

in holding that plaintiffs may pursue claims for violations of norms which are clearly defined,

meaning norms that are "specific, universal, and obligatory."  542 U.S. at 732.  The Court did not

criticize a single case in which an international human rights norm had been recognized, other

than the arbitrary arrest claim at issue in *Sosa* itself. Defendants' argument that cruel, inhumane,

and degrading treatment or punishment (CIDTP) is not an actionable norm under the ATS post-

*Sosa* is therefore misguided.  Coca-Cola Br. at 35-36.  There was no CIDTP claim at issue in

Sosa and numerous cases have ruled that there exists a specific, universal and obligatory norm

against CIDTP.  *See, e.g.*, *Cabello,* 402 F.3d 1148; *Abebe-Jira,* 72 F.3d at 847; *Tachiona*, 234

F. Supp.2d at 435-36; *Mehinovic*, 198 F. Supp.2d at 1347. *See also* Restatement (Third) of

Foreign Relations Law § 702.

Moreover, Plaintiffs' allegations relating to the torture claims are sufficient to also allow

recovery for CIDTP.  *See* Section III (I)(1), *supra*.  As this Court has explained, various

authorities and international instruments make clear that the prohibition against CIDTP is

conceptually linked to torture by shades of misconduct discernable as a continuum.  The

gradations of the latter are marked only by the degrees of mistreatment the victim suffers, by the

level of malice the offender exhibits and by evidence of any aggravating or mitigating

considerations.  *Tachiona*, 234 F. Supp. 2d at 437.  *See also Mehinovic*, 198 F. Supp. 2d at 1348

54

n.33 ("[C]ruel, inhuman, or degrading treatment includes acts which inflict mental or physical suffering, anguish, humiliation, fear and debasement, which do not rise to the level of 'torture' or do not have the same purposes as 'torture'"). There is no question that Plaintiffs' allegations, stating they were severely beaten and repeatedly sprayed with tear gas in an enclosed space, and even after being incapacitated by the gas, were again beaten and brutally kicked, are sufficient physical and mental pain to constitute CIDTP. *See* Compl. ¶¶ 38-89.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss should be denied in their entirety. Most of Plaintiffs' claims are based on U.S. conduct against U.S. Defendants, and are simply not properly subject to an FNC assertion. Moreover, if any part of the case must be heard in this Court, the entire case must be retained. In any event, Defendants have failed to meet their burden of showing that any of the claims could be heard in Turkey. On the merits, Plaintiffs have stated legally-viable claims, and should now be permitted to proceed to discovery.

Dated: June 16, 2006

Respectfully submitted,

By: _____

Terry Collingsworth (TC 2162)

Attorney for Plaintiffs