UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------- X
EROL TUREDI et al.,            :
                              :    05 Civ. 9635
              Plaintiffs,      :
                              :
   - against -                 :    **DECISION AND ORDER**
                              :
THE COCA COLA COMPANY, et al., :
                              :
              Defendants.      :
-------------------------------- X

**VICTOR MARRERO, United States District Judge.**

Plaintiffs (collectively "Plaintiffs"), all citizens of Turkey, brought this action asserting claims under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 note, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., and New York common law and statutory causes of action. Defendants include the Coca-Cola Company ("Coca Cola"), Coca-Cola Export Corporation ("CCEC"), Coca-Cola İçecek, A.S. ("CCI"), and several corporate Does (collectively "Defendants"). The injuries Plaintiffs assert arose from an alleged violent attack on them by Turkish police during a labor dispute in Istanbul, Turkey between Plaintiffs and CCI, an entity that had employed some of the Plaintiffs and that they claim is controlled by or an agent of Coca Cola and CCEC. Defendants move to dismiss the complaint on the grounds of forum non conveniens, international comity, the act of state doctrine, absence of subject matter jurisdiction, and failure

to state any claim on which relief may be granted.  CCI additionally contests the Court's personal jurisdiction over CCI.  For the reasons stated below, Defendants' motions to dismiss the complaint on forum non conveniens grounds are GRANTED.

## I. <u>FACTS</u>[1]

Plaintiffs include trade union members once employed by CCI, a Coca Cola bottling and distributing joint venture with its principal place of business in Istanbul, as drivers and other transport workers to deliver Coca Cola products in Istanbul and neighboring areas.  According to the complaint, prior to 2000, delivery workers of CCI were organized in a union and their relationship was governed by a collective bargaining agreement with the company.  In 2000 the workers were forced to resign from the union.  Allegedly to punish

---

[1]  The recitation of the facts described below derives from Plaintiffs' complaint.  In ruling on the instant motions, the Court has considered the Memorandum of Law In Support of Defendants The Coca-Cola Company and Coca-Cola Export Corporation Motion to Dismiss For *Forum Non Conveniens*, International Comity, Lack of Subject Matter Jurisdiction, And Failure To State A Claim Upon Which Relief Can Be Granted ("Defs. Mem."), dated March 24, 2006) ("Defs. Mot."); Memorandum of Law In Support of Motion to Dismiss of Defendant Coca-Cola İçecek A.S., dated March 24, 2006 ("CCI Mot."); Plaintiffs Joint Memorandum of Points and Authorities In Opposition To All Defendants' Motions To Dismiss, dated June 16, 2006 ("Pls. Mem."); Reply Memorandum of Law in Support of Defendants The Coca-Cola Company and Coca-Cola Export Corporation's Motion to Dismiss for *Forum Non Conveniens*, International Comity, Lack of Subject Matter Jurisdiction, and Failure to State a Claim Upon Which Relief Can Be Granted, dated August 15, 2006; Reply Memorandum In Support of Motion to Dismiss of Defendant Coca-Cola İçecek A.S., dated August 15, 2006; as well as the various attachments accompanying these documents.  Except where specifically quoted, no other direct reference will be made to these materials.

-2-

workers who had unionized and discourage others, CCI, acting
under the direction and control of Coca Cola and CCEC in the
United States, assigned workers at two CCI facilities in
Istanbul, Dudullu and Yenibosna, to a contractor, Nakliyat ve
Ticaret Ltd. ("Trakya").  However, the workers continued to
function in every way as they previously had operated while
delivering Coca Cola products as CCI employees, including use
of the same trucks and uniforms, and reporting to the same
facilities and supervisors.  On this basis, Plaintiffs contend
that Trakya was nothing more than a paper shell or agent of
CCI and its joint venture partners, including Coca Cola and
CCEC.

The workers at Dudullu and Yenibosna continued their
efforts to organize from 2002, and by May 2005 about 90
percent of the total of 110 workers at the plants had formally
expressed desire to join a union of transport workers (the
"Union") affiliated with DISK, a progressive trade union
federation of Turkish workers.  On May 12, 2005, the union
filed papers with the Turkish Ministry of Labor seeking formal
recognition.  A week later five employees at Dudullu
identified as the leaders of the union organization effort
were fired, allegedly for poor performance.  This action was
followed by the termination of fifty more union workers at
Dudullu and fifty at Yenibosna.  The workers staged a protest

in front of the plants by erecting cardboard shelters and were evicted from the sites by Turkish police, allegedly on orders from CCI.   Plaintiffs claim that, to prevent them from entering the property again, CCI then purchased the private lot in front of the Dudullu facility where the protest had occurred.

After the terminations the 105 Union workers, a group of them and Union representatives met with CCI officials, some of whom also held regional positions with Coca Cola.  They were allegedly told that Coca Cola was concerned that if the employees at Dudullu and Yenibosna were allowed to unionize, workers at other Coca Cola plants in Turkey would demand to do so as well.

In the morning of July 20, 2005 workers from both plants, some joined by family members, assembled outside the Dudullu facility to peacefully demonstrate against the terminations and demand reinstatement to their jobs.   While Union representatives were meeting with CCI officials, members of Çevik Kuvvet, a special branch of the Turkish police, who Plaintiffs allege "use violence on workers and union members with impunity" (Compl. ¶ 40), had been monitoring the protest. Allegedly with the knowledge and at the direction of CCI managers, who in turn were acting on behalf of Coca Cola and CCEC, the police attacked the demonstrators with gas and clubs

-4-

to evict them from the CCI property they were occupying.  At around 8:00 p.m.  Plaintiffs were hauled away in police vans, thereafter suffering additional attacks while in police custody.  They remained in jail until released on the following day, July 21, 2005, at between 5:00 and 5:30 a.m.

On these facts, Plaintiffs contend that this case "involves the systematic intimidation and torture of trade unionists and their families in Istanbul, Turkey" (id. ¶ 3), and that Defendants arranged for the Çevik Kuvvet to assault and arrest Plaintiffs "for the purpose of coercing and intimidating the union members into abandoning their effort to form a union at the Coke facilities, and to terrorize the workers into accepting their mass terminations without further protest" (id. ¶ 18).

Plaintiffs assert that Coca Cola, through CCEC, owns 40 percent of the CCI joint venture and that, through placements of board members under its Bottler's Agreement, the company has exercised a "particularly high level of control and supervision over CCI." (Id. ¶ 91.)  By means of its Bottler's Agreement with joint venturers and licensees such as CCI, Coca Cola and CCEC impose standards governing product quality, marketing, bottling and materials used in production.  For these purposes they possess the right to inspect products, plants and other aspects of production.  Pointing to this

authority and forms of external controls, Plaintiffs allege that CCI "does not have any independent authority to make or implement decisions regarding its business practices or direction, but is the agent, alter-ego and/or instrumentality of Coke and the CCI co-venturers." (Id. ¶ 100). Plaintiffs contend that Coca Cola and CCEC are jointly liable to Plaintiffs for the injuries they suffered through the acts of CCI. Specifically, Plaintiffs argue that Coca Cola can control whether its bottlers abide by international human rights conventions and national laws, and can enforce compliance by withdrawing its agreements governing the commercial use of Coca Cola's name and products from any bottlers that engage in violence against organized labor. According to Plaintiffs, consistent with these policies, Coca Cola makes representations to consumers, in order to induce them to purchase Coca Cola products, that Coca Cola requires entities associated with its system to abide by the laws and regulations of the country in which they operate. Despite these policies, Plaintiffs further maintain, Coca Cola and CCEC have taken no action to punish any of the CCI managers implicated in the violence committed against Plaintiffs.

After their release the Union-member Plaintiffs continued their peaceful protest outside their former workplaces. Eventually, CCI presented them an offer purportedly on behalf

of Trakya, providing for back pay without reinstatement.  The workers accepted this arrangement, so as to resolve their "local labor dispute," but asserting in the complaint that the settlement was intended only "to cover the local labor dispute, not the violence by the Çevik Kuvvet." (Id. ¶ 90.)

## II.  **JURISDICTION**

Plaintiffs invoke the Court's federal question jurisdiction pursuant to 28 U.S.C. § 1331; the ATS and the TVPA with regard to their claims alleging violations of international human rights law; RICO as to Defendants' alleged racketeering activity; and supplemental jurisdiction in respect of various New York statutory and common law causes of action, including assault, battery, negligence, intentional and negligent infliction of emotional distress, false imprisonment, fraudulent misrepresentation, injurious falsehood, unjust enrichment, and deceptive practices.

Defendants assert several grounds in support of their motions to dismiss: forum non conveniens; international comity; the act of state doctrine; failure to establish subject matter jurisdiction or to state a claim for relief under the ATS, TVPA or RICO. CCI additionally challenges the Court's personal jurisdiction over CCI.

As a preliminary matter, the Court considers whether it must address the jurisdictional objections raised by

Defendants' motions before reviewing their grounds to dismiss under the doctrine of forum non conveniens.   This question presents two issues that, with conflicting results, have arisen with some frequency in this context.  First is whether a dismissal warranted by forum non conveniens constitutes a merits-based decision and therefore, consistent with the bounds of Article III of the federal Constitution, the doctrine cannot be applied without a prior adjudication of the court's subject matter jurisdiction.   The second issue is whether, even if the rule implicates no determination on the merits of dispute, the Court nonetheless must address the forum question sequentially after confirming that it possesses jurisdiction over the subject matter and over the parties.  A substantial Circuit Court split now exists concerning these questions.

        In Dominquez-Cota v. Cooper Tire & Rubber Co., the Fifth Circuit ruled that it was unable to characterize forum non conveniens as a "non-merits" issue because in assessing a motion for dismissal on forum non conveniens grounds the court necessarily "'becomes entangled in the merits'" of a dispute, and therefore a forum non conveniens determination could not be made before the court confirmed its subject matter jurisdiction. 396 F.3d 650, 654 (5th Cir. 2005) (quoting Van Cauwenberghe v. Biard, 486 U.S. 517, 528 (1987)).   In an

-8-

earlier case examining the same issue, the D.C. Circuit reached an opposite result.  See In re Papandreou, 139 F.3d 247 (D.C. Cir. 1998).  It concluded that a finding of forum non conveniens is "merits-free," and therefore a dismissal on such grounds before the Court's determination of subject matter jurisdiction "makes no assumption of law-declaring power that violates the separation of powers principles." Id. at 255.

The Second Circuit pronounced its position on these questions in Monegasque de Reassurances S.A.M. v. NAK Naftogaz of Ukraine, 311 F.3d 488 (2d Cir. 2002).  Subscribing to the reasoning in Papandreou, it held that neither it nor district courts in this Circuit are barred from bypassing questions of jurisdiction and proceeding directly to rule on an invocation of forum non conveniens, at least where any jurisdictional challenge does not implicate a threshold constitutional question.  See id. at 497 (citing Fama v. Commissioner of Corr. Servs., 235 F.3d 804, 816 n.11 (2d Cir. 2000)). More recently, in Dattner v. Conagra Foods, Inc., the Second Circuit, noting the Circuit split on these issues and disagreeing with the contrary view articulated by the Fifth Circuit, reaffirmed its finding in Monegasque that a forum non conveniens dismissal "is a non-merits decision akin to dismissal for lack of personal jurisdiction," and hence

-9-

requires no antecedent verification of jurisdiction.  458 F.3d 98, 102 (2d Cir. 2006) (per curiam).  In so concluding, the Monegasque court pointed to the Supreme Court's acknowledgment that "some of its precedents have 'diluted the absolute purity of the rule that Article III jurisdiction is always an antecedent question.'"  Monegasque, 311 F.3d at 497 (quoting Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 101 (1998)).  The Second Circuit construed the Supreme Court's disapproval of the assumption of hypothetical jurisdiction for the purpose of deciding the merits of a dispute, a doctrine reinforced in Steel Co., to apply only to bar resolution of contested questions of law when the court's jurisdiction is in doubt, and more specifically, where the potential lack of jurisdiction raises no constitutional issues.  See id.

Recently, the Third Circuit staked out another course, essentially departing from these courts on both counts. Rejecting the Fifth Circuit's reasoning, it ruled that forum non conveniens "is a non-merits ground for dismissal." Malaysia Int'l Shipping Corp. v. Sinochem Int'l Co. Ltd., 436 F.3d 349, 359 (3d Cir. 2006), cert. granted, ___ U.S. ___, No. 06-102, 2006 WL 2055541 (Sept. 26, 2006).  At the same time, disagreeing with the D.C. Circuit and the Second Circuit, the Third Circuit declared that a ruling on a forum non conveniens "presumes that the court deciding this issue has valid

-10-

jurisdiction (both subject matter and personal jurisdiction) and venue." Id. at 361. It held that district courts "must have jurisdiction before they can rule on which forum, otherwise available, is more convenient to decide the merits." Id. at 363-64; see also Kamel v. Hill-Rom Co., 108 F.3d 799 (7th Cir. 1997); Patrickson v. Dole Food Co., 251 F.3d 795 (9th Cir. 2001), aff'd in part, cert. dismissed in part, 538 U.S. 468 (2003).

Nonetheless, Monegasque represents the law in this Circuit on this subject, and the Court accordingly follows it in proceeding below to consider directly Defendants' invocation of forum non conveniens. However, while ordinarily Monegasque would be the last word here on this issue, rendering it unnecessary for the Court to tarry any longer with consideration of whether it may bypass inquiry concerning subject matter and personal jurisdiction prior to ruling on Defendants' inconvenient forum challenges, the Court nonetheless feels obliged to add some supplemental considerations. It does so because when Monegasque was decided, the Circuit split that became pronounced and was intensified by Malaysia had not manifested. Thus, neither the district court nor the Second Circuit in Monegasque had occasion to fully address the conceptual grounds and supporting arguments articulated by the Third Circuit to

-11-

underpin its divergence from Papandreou and Monegasque.  On
the prospect that this basic jurisdictional disagreement, with
its now clearer demarcations, is reopened on any appeal of
this action, the Court deems it appropriate to elaborate on
its consideration of the questions that frame the debate, and
to point out how the particular facts and issues presented
here compellingly support the approach taken in Monegasque in
permitting a preemptive dismissal on forum non conveniens
grounds. As a foundation for the discussion, the Court
underscores some points that may not have been thoroughly
examined in the earlier disputes on these issues as previously
argued before this Court.

A helpful starting point in this endeavor is a review of
the basis of authority and the avowed purpose of forum non
conveniens.  In answer to both prongs of this inquiry, the
Second Circuit has declared that the doctrine "finds its roots
in the inherent power of the courts 'to manage their own
affairs so as to achieve the orderly and expeditious
disposition of cases.'" Monegasque, 311 F.3d at 497 (quoting
Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991)) (emphasis
added).

Inherent power is one of the several sources of
decisional authority that occupy the repository of judicial
power conferred by Article III of the Constitution.  Though

not explicitly mentioned in Article III, inherent power there resides among the grounds that are expressly enumerated which provide warrant for federal courts to exercise jurisdiction. See Chambers, 501 U.S. at 43 (acknowledging that inherent powers are those that "'must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot be dispensed with in a Court, because they are necessary to the exercise of all others'" (quoting United States v. Hudson, 11 U.S. (7 Cranch) 32, 34 (1812)); see also In re Martin-Trigona, 795 F.2d 9, 10-11 (2d Cir. 1986) (acting to enjoin a litigant pursuant to the court's "inherent power to protect our jurisdiction from conduct that threatens our ability to carry out Article III functions"). By contrast, the federal judiciary's Article III express empowerments encompass the original mandates that issue from specific powers described in the Constitution itself, and the derivative competence invested by statute enacted pursuant to Article III. Combined, these latter sources comprise subject matter jurisdiction, what the Supreme Court has characterized as "the courts' statutory or constitutional power to adjudicate the case." Steel Co., 523 U.S. at 89 (emphasis in original).

In this connection, inherent power in the service of the courts' judicial efficiency interests plays a vital role in

Article III's jurisdictional design complementary to the courts' law-declaring function.  For it embodies a potent device, the often critical interim authority a court possesses to exercise jurisdiction to determine whether it has jurisdiction over a given matter. See United States v. United Mine Workers, 330 U.S. 258, 293 (1947) ("[T]he District Court had the power to preserve existing conditions while it was determining its own authority to grant injunctive relief."); In re Dairy Mart Convenience Stores, Inc., 411 F.3d 367, 374 (2d Cir. 2005) ("The question of whether federal jurisdiction exists is not always free from doubt, and a federal court may have to examine and determine the facts and the law before concluding whether jurisdiction is appropriate.  Thus, it follows that 'a court has jurisdiction to determine its own jurisdiction.'") (quoting United Mine Workers, 330 U.S. at 292).

The Supreme Court has endorsed the observation that "'Jurisdiction ... is a word of many, too many, meanings.'" Steel Co., 523 U.S. at 90 (quoting United States v. Vanness, 85 F.3d 661, 663 n.2 (D.C. Cir. 1996)).  One such meaning is "power to declare the law." Ex parte McCardle, 74 U.S. (7 Wall) 506, 514 (1868).  Another distinct sense of the term commonly used in statutes, as the Supreme Court acknowledged in Steel Co., connotes "remedial powers of the court," as

-14-

opposed to the substantive elements that constitute a cause of action and thereby confer law-declaring subject matter jurisdiction.  523 U.S. at 90. (emphasis in original).

In Steel Co., the Supreme Court identified two types of federal jurisdictional disputes that emanate from Article III and classified them in a decisional order of operations. First are "nondiscretionary jurisdictional question[s]" that implicate the existence of Article III authority -- constitutional standing, for example -- and thus that courts cannot set aside, but must resolve before adjudicating the merits of a dispute. Steel Co., 523 U.S. at 100 n.3 (explaining that in a decision affirming a district court's "discretionary declination of pendent jurisdiction ... the case decided not a merits question before a jurisdictional question, but a discretionary jurisdictional question before a nondiscretionary jurisdictional question"). Second are "discretionary" jurisdictional questions, as to which the courts may decline to exercise judicial authority they presumably possess, and to dismiss an action prior to a determination of whether in fact subject matter jurisdiction prescribed in accordance with Article III exists and preceding any examination of the merits.  Id.

The structural basis for the preceding distinction may be found in the source of Article III power which governs the

courts' exercise of jurisdiction in the particular case.  The courts cannot sidestep a nondiscretionary threshold jurisdictional question and proceed to rule on the merits of a case because the existence of subject matter jurisdiction is determined by the authority contained in the explicit terms of Article III that define the "'nature and limits of the judicial power of the United States,'" and thus embody the principle of separation of powers.  Id. at 94-95 (quoting Mansfield, C.& L.M. Ry. Co. v. Swan, 111 U.S. 379, 382 (1884)).  Discretionary jurisdictional questions, on the other hand, emanate from judicial latitude accorded by statute or by judicially self-imposed limits on exercise of jurisdiction that are drawn from the courts' inherent power, and ordinarily implicate application of the courts' sound judgment in matters concerning the proper administration of judicial affairs.  Among the jurisdictional disputes that commonly arise from such judge-made doctrine are those involving  mootness, ripeness, proper venue, and common law standing.  See, e.g., United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966) (noting that justification for discretionary pendent jurisdiction rests in part on "considerations of judicial economy"); 13A Charles A. Wright et al., Federal Practice & Procedure § 3533.1, at 222 (2d ed. 1984)  ("Beyond the Article III core, mootness decisions frequently reflect avowedly flexible

doctrines of remedy and judicial administration.").

In the discretionary category the Supreme Court has recognized several types of common jurisdictional disputes. In Steel Co., for example, the Supreme Court specifically mentioned judicial abstention to exercise pendent jurisdiction over state-law claims as an instance of a non-merits jurisdictional question that may justify dismissal of a case ahead of a ruling on subject matter jurisdiction. See 523 U.S. at 100 n.3 (citing Moor v. County of Alameda, 411 U.S. 693 (1973)). Similarly, in Ruhrgas AG v. Marathon Oil Co. the Supreme Court equated dismissals predicated on the absence of personal jurisdiction to those based on "non-merits grounds." 526 U.S. 574, 584 (1999).  It held that because such actions do not entail exercise of judicial power to adjudicate the merits, there is no constitutional rule prescribing a sequential hierarchy directing the order of a court's assessment of its jurisdiction. See id. at 578 ("[T]here is no unyielding jurisdictional hierarchy.").  Consequently, a court is not barred from considering personal jurisdiction and dismissing an action on this ground before inquiring into its subject matter jurisdiction.

The Supreme Court has also identified disputes over proper venue as among discretionary non-merits jurisdictional questions over which courts may exercise authority to dismiss

without adherence to any rigid decisional line. In considering whether a challenge to personal jurisdiction must be resolved before a question concerning venue, the Supreme Court concluded that "when there is a sound <u>prudential</u> justification for doing so ... a court may reverse the normal order of considering personal jurisdiction and venue." <u>Leroy v. Great Western United Corp.</u>, 443 U.S. 173, 180 (1979) (emphasis added); <u>see also</u> <u>Ellis v. Dyson</u>, 421 U.S. 426, 433-34 (1975) (abstention from interfering with state judicial proceedings pursuant to the doctrine of <u>Younger v. Harris</u>, 401 U.S. 37 (1971), without preceding inquiry as to existence of subject matter jurisdiction); <u>Arizonans for Official English v. Arizona</u>, 520 U.S. 43, 66-67 (1997) (dismissal on mootness grounds bypassing analysis of a challenge on statutory standing to sue).

At bottom, as the Supreme Court has recognized, a common thread running through these instances of discretionary jurisdictional questions is overriding "concerns of judicial economy and restraint." <u>Ruhrgas</u>, 526 U.S. at 586. Because these cases essentially raise issues entailing comity, procedure, efficiency and other prudential considerations, they implicate the courts' ability to effectively manage judicial business. For this reason, these values counsel pragmatism and flexibility in the courts' assessment of

whether or not to bypass a review of the merits of an action and in arranging the order of resolution of the disputes presented.    A shorthand expression for these institutional interests in the administration of justice is according judges optimal freedom to judge, in other words, sufficient decisional room, short of prematurely adjudicating the merits of a controversy, within which to exercise sound judgment in the choice of means at their disposal to guide the disposition of litigation unhampered by the constraints of excessive formalism.    That discretion should include, for instance, determining which issues are ripe for resolution and in what decisional order, when and where restraint is appropriate, as well as how best to maximize judicial economy.    Our judicial system, the Supreme Court has reassured, "allows leeway for sensitive judgments of this sort."    <u>Id.</u> at 587.

Synthesized, therefore, <u>Steel Co.</u>, <u>Ruhrgas</u>, and <u>Leroy</u> may be read to suggest a proposition the <u>Ruhrgas</u> Court remarked "is hardly novel": that federal courts possess authority, presumably springing from inherent power to manage their affairs efficiently, "to choose among threshold grounds for denying audience to a case on the merits." 526 U.S. at 585. In applying this latitude, the courts may rely as appropriate on either nondiscretionary or discretionary jurisdictional questions to support dismissal of actions that do not

-19-

implicate resolution of the merits, depending upon considerations such as the complexity or novelty of the legal issues that the jurisdictional challenge raises, substantial uncertainty as to applicable law or policy of other jurisdictions, and principles of comity -- in short, the time and expense necessary to address difficult discretionary issues first.   Justifying the flexibility this doctrine confers is recognition that jurisdictional consideration of tangled circumstances such as these could entail extensive discovery, significant costs, delays and judicial inquiry into highly sensitive political or public policy questions.   On this basis, a court presented with a complex jurisdictional dispute involving difficult or novel questions of law does not abuse its discretion if in the interest of judicial economy it declines to pursue the more complicated and costly course and turns instead to a more easily resolvable non-merits discretionary question.   See Ruhrgas, 526 U.S. at 588.

The doctrine of Steel Co.  and its related cases may also be read essentially to elaborate on or modify the Supreme Court's statement in Gulf Oil Corp. v. Gilbert that "forum non conveniens can never apply if there is an absence of jurisdiction or mistake of venue."  330 U.S. 501, 504 (1947). This remark and other blackletter formulations of the forum non conveniens doctrine served as the starting point and

cornerstone for the Third Circuit's analysis and holding in
<u>Malaysia International</u>.  <u>See</u> 436 F.3d at 361-62; <u>see</u> <u>also</u> 15
Charles A. Wright et al., <u>Federal Practice and Procedure</u> §
3828, at 287 (2d ed. 1986).   But the <u>Gilbert</u> Court's
observation does not address two points on which the Supreme
Court's later rulings addressing the jurisdiction decisional
line shed additional light.   First, the <u>Gilbert</u> Court's
assumption that a court ruling on a forum non conveniens
motion must have jurisdiction to do so makes no express
pronouncement that the existence of jurisdiction must first be
formally verified, or that the court's application of the
doctrine must adhere to a prescribed decisional sequence
following the disposition of any jurisdictional disputes.
Nothing in <u>Gilbert</u> could be construed as explicitly
enunciating such a rule.   In any event, as the Second Circuit
declared in <u>Monegasque</u>, in fact forum non conveniens derives
from the courts' "inherent power," <u>see</u> 311 F.3d at 497, a
source of jurisdiction that grants them discretion to decide
their order of operations of discretionary questions.

Second, more specifically, the later Supreme Court
jurisprudence makes clear that federal courts do possess such
discretionary authority to arrange non-merits jurisdictional
questions in a manner to achieve maximum judicial efficiency,
and for this purpose to abstain from exercising jurisdiction

they may have.  By analogy to the proposition that courts have
inherent power to assert temporary jurisdiction, in the
interest of justice and sound disposition of cases, in order
to confirm the existence and scope of their jurisdiction, the
converse should also follow: that the courts should be able to
exercise inherent authority as well to decline to inquire into
their jurisdiction if, consistent with similar concerns about
furthering justice and judicial economy, a more suitable and
expeditious non-merits disposition is available.

     The courts' authority to decline jurisdiction and
dismiss an action on the basis of forum non conveniens fits
properly within the judicial power design and purposes
described above.  It presents another species of discretionary
jurisdictional question grounded on the exercise of the
courts' inherent power.  See Gilbert, 330 U.S. at 506
(explaining that forum non conveniens entails a "discretionary
judgment as to whether the suit should be entertained"); see
also Monegasque, 311 F.3d at 497.  Further elaborating on the
contours of forum non conveniens, the Supreme Court declared
in American Dredging Co. v. Miller that the doctrine "is not
a substantive right of the parties, but a procedural rule of
the forum." 510 U.S. 443, 454 n.4 (1994).  To this extent, the
rule "is nothing more or less than a supervening venue
provision ... a matter that goes to process rather than

substantive rights." <u>Id.</u> at 453 (emphasis added). In furtherance of its ends to foster judicial efficiency, forum non conveniens permits the courts to decline jurisdiction "when it appears that the convenience of the parties and the court and the interests of justice indicate that the action should be tried in another forum." 17 James W. Moore, <u>Moore's Federal Practice</u> § 111.70, at 111-211 (3d ed. 2006). Thus, most central to the values the doctrine seeks to achieve are "reasons of convenience, judicial economy and justice," <u>Monegasque</u>, 311 F.3d at 497, so as to make the trial of a case "'easy, expeditious and inexpensive,'" <u>American Dredging</u>, 510 U.S. at 448 (quoting <u>Gilbert</u>, 330 U.S. at 508).

By extension of the foregoing principles, insofar as the forum non conveniens rule stems from the courts' inherent power to manage judicial business, this source of discretionary authority to decline an exercise of jurisdiction serves as the wellspring of judicial power that, either standing alone or in conjunction with the express competence conferred within the confines of Article III, should enable the courts, at their discretion, to choose which basis for decision to employ and in what order to dispose of a dispute over proper forum, without first being compelled to undertake an exhaustive jurisdictional analysis. In circumstances where nondiscretionary jurisdictional questions do not raise an

-23-

antecedent bar, inherent authority would warrant dismissal of an action on forum non conveniens grounds prior to a full-scale inquiry to confirm the existence of subject matter or personal jurisdiction in cases where the forum question would be easier to resolve and thereby obviate consideration of the more complex disputes.   Enabling the courts, at their discretion, to adjudicate forum non conveniens objections first in the decisional sequence serves the interests of justice, convenience of the parties and judicial economy that actuate the doctrine.   That course not only promotes greater efficiency, but avoids the potentially far greater legal implications to the rights of the parties and the future of their litigation that are embodied in questions of issue preclusion, as well as the political, policy, and comity issues often associated with dismissal on jurisdictional grounds.

It was essentially these circumstances and reasoning that the <u>Monegasque</u> court found sufficiently comparable and persuasive in deciding that nothing barred the court from avoiding analysis of personal and subject matter jurisdiction and proceeding directly to examine the challenge asserted on forum non conveniens grounds.   <u>See</u> 311 F.3d at 498 ("'Forum non conveniens does not raise a jurisdictional bar but instead involves a deliberate abstention from the exercise of

jurisdiction.... [S]uch abstention ... is as merits-free as a finding of no jurisdiction.... Similarly, dismissal for want of personal jurisdiction is independent of the merits and does not require subject matter jurisdiction.'") (quoting Papandreou, 139 F.3d at 255-56).

The action now before the Court represents a prime example of why, in accord with the preceding principles, preemptive dismissal of a suit on the basis of forum non conveniens prior to the court's confirmation of personal or subject matter jurisdiction is justified.  This course would be warranted in accordance with a species of procedural and remedial authority exercised pursuant to the court's inherent power to manage its docket in the interest of justice, convenience of the parties, and judicial economy. The case also illustrates how the express practical concerns and administration of justice purposes that underlie the doctrine would be subverted by a rule prescribing a rigid sequential order in the Court's exercise of subject matter and/or personal jurisdiction ahead of its concurrent inherent power to resolve procedural and discretionary jurisdictional questions in the manner the court deems best designed to achieve prudent, expeditious and reasonable disposition of cases, while placing the least burdens on the resources of the parties and the Court.  Indeed, with these judicial efficiency

-25-

interests in mind, when Defendants' motions to dismiss were first raised with the Court at an early conference with the parties, the Court directed the parties to address Defendants' forum non conveniens grounds first.

As the factual recitation above demonstrates, the case presents immensely complex jurisdictional issues. None of the challenges Defendants assert, however, directly implicate constitutional issues alerting the Court to the existence of a nondiscretionary jurisdictional question that, consistent with Article III of the Constitution, must be resolved as a matter of priority before addressing the merits, or matters implicating discretionary authority. See Steel Co., 523 U.S. at 100 n.3; Monegasque, 311 F.3d at 497. Specifically, Coca Cola, CCE and CCI all base their subject matter jurisdiction challenges on statutory grounds -- that the conduct of Turkish police that Plaintiffs allege does not amount to torture under the ATS or norms of international law, and that the pleadings are not sufficient to make out a case under RICO. Even so, adding to the complications, the jurisdictional objections asserted here extend to both personal and subject matter grounds.

With regard to personal jurisdiction, the action involves a foreign entity associated with a domestic corporation by means of the latter's ownership of a minority

-26-

joint venture interest, as well as by related product licensing and distribution agreements.  Whether or not the foreign entity qualifies as sufficiently present in this District to warrant application of New York's long arm statute consistent with federal due process, would require a substantial evidentiary record potentially entailing jurisdictional discovery, more extended briefing and extensive review by the Court of documents bearing on the precise business relationship among Coca Cola, CCEC and CIC. Depending on the level of contacts and association of CCI with the United States or this District that the facts develop, a potential constitutional issue could arise implicating CCI's due process rights.

Substantively, the subject matter jurisdiction questions at issue in the federal causes of action Plaintiffs assert are by no means among those the Supreme Court had in mind when it observed that "in most instances subject-matter jurisdiction will involve no arduous inquiry." Ruhrgas, 526 U.S. at 587. That remark may be apt in cases where the subject matter challenge entails for instance, easily resolvable disputes concerning the residence of parties or the amount in controversy in a federal action invoking jurisdiction based on diversity of citizenship.  Instead, here Plaintiffs' claims derive from uniquely intricate federal statutory schemes

implicating both domestic and international law.  To that extent "the alleged defect in subject-matter jurisdiction raises a difficult and novel question."  Id.

Under RICO, even in the most commonplace action a challenge to subject matter jurisdiction can entail a bewildering labyrinth of pretrial litigation typically demanding extensive briefing, a detailed factual record, and lengthy review by the Court.  Ordinarily these tasks impose a considerable drain on judicial resources.  These complications expand proportionately in a case, such as the one at hand, where the alleged conspirational racketeering activities involve alleged transnational conduct in the United States and in a foreign country.

Equally formidable to assess are claims brought under the ATS and TVPA, especially when they present allegations of torture, human rights offenses, and other misconduct by government officials of another country.  Typically, the subject matter jurisdiction complexities in such cases implicate the applicability under foreign law of doctrines of probable cause, forms of official immunity and exhaustion of remedies, as well as international comity, acts of state, and related defenses.

Adding to the difficulties posed by this case and a growing number of others like it is the courts' encounter with

numerous public policy issues necessarily implicated in the controversy.  Two vital developments have particular bearing in this context:  the rapid growth of transnational commerce in an increasingly global economy and, also as an offshoot of recent international developments, the expanding scope of universally recognized human rights.  Both of these circumstances impact on our courts.  As a by-product of the strong justice system this country has established over time, the number of lawsuits commenced in the United States based on transactions and events that occur abroad is likely on the rise, though often the connection of these actions to the United States is minimal at best.  As illustrated by the case at hand, a common pattern emerges from many of these lawsuits: foreign plaintiffs vilifying the justice and political systems of their own countries as corrupt, ineffective or grossly deficient in other ways; injuries occurring from alleged violence and human rights abuses committed by foreign authorities and/or their local and/or external agents; American corporations accused of complicity in corruption, fraudulent practices and other violations of international, domestic and foreign law that allegedly cause harm to foreign plaintiffs abroad.

Typically, these controversies raise the potential for courts to pass judgment on several issues -- always delicate

for judicial consideration -- implicating, for instance: international comity; United States foreign policy interests; the lawfulness of official conduct by foreign government agents; extraterritorial application of American law; the need to allow the justice systems of other nations involved to apply their laws and reform their governmental institutions so as to adjudicate these controversies free from external interference; the extent to which American corporations engaged in substantial commerce abroad should be subject to legal accountability under the laws of the countries where they transact business when their operations cause injuries there. For the most part, these issues fall within the realm of political and public policy questions beyond the proper domain of our courts. In consequence, not infrequently, when they arise in the context of forum non conveniens analysis, the circumstances weigh heavily in favor of dismissal of the actions, either as considerations taken into account in the Gilbert balancing test, or as independent grounds supporting judicial abstention.

Two additional points emerge from these circumstances relevant to the question of the Court's proper approach in resolving the jurisdictional questions at hand. First is that insofar as the number of such cases our judicial system encounters does increase, the more prudential course,

consistent with the Court's inherent power to manage the administration of justice efficiently and fairly, counsels for more rather than less pragmatism and flexibility, and thus against unduly constraining the exercise of the Court's discretionary authority to dismiss on forum non conveniens grounds.  Second, in any event, in many instances it is palpable from comparative analysis that, even on the face of the litigation, the intractable difficulties these transnational conflicts present when they involve foreign plaintiffs and underlying events occurring abroad that have nominal other contacts with the United States, not only compel strongly towards dismissal under application of forum non conveniens standards, but more often than not demonstrate that the proper tribunal inquiry is far simpler to resolve than is an unraveling of the underlying jurisdictional disputes. Thus, as suggested above, in these cases any antecedent inquiry into subject matter jurisdiction would prove somewhat pointless.

Accordingly, to no lesser degree than objections based on questions of personal jurisdiction, assessment of subject matter jurisdiction before forum non convenviens analysis in this case raises many of these concerns and would likely require a substantial factual record, which in turn would demand a significant amount of additional discovery and

extended pretrial proceedings.

Undertaking such jurisdictional proceedings at this stage of the litigation could yield several potential results.  The Court could find that it has subject matter jurisdiction over all three federal statutory grounds -- the RICO, ATS and TVPA -- or over one or more but not all of these counts.  With regard to CCI, the Court could determine that it has personal jurisdiction, and subject matter jurisdiction with regard to all, or some but not all of Plaintiffs' claims.  Or the Court could conclude that it has subject matter jurisdiction with regard to some or all of the federal claims, but no personal jurisdiction over CCI, which potentially is a necessary party to this litigation.

No doubt, any of these outcomes would entail potentially immense expenditures of resources on the part of the parties and the Court, as well as ensuing delays in the resolution of the merits of the underlying dispute. Such prospects raise a threshold question: to what end?  What justifiable gain, consistent with forum non conveniens values serving the interest of justice and judicial efficiency, would be netted by a prior jurisdictional inquiry and adjudication in a case where, on the court's preliminary assessment, the forum non conveniens analysis is "straightforward" in relative comparison with the complexities of the jurisdictional issues?

Ruhrgas, 526 U.S. at 588.  Here, the forum analysis does not implicate any potential constitutional dispute, and even on cursory review compellingly weighs for dismissal in favor of a more suitable alternative tribunal.

In a case in which it is virtually predictable in the final analysis that even if a prospective jurisdictional inquiry would yield a ruling that the court has subject matter and personal jurisdiction, the circumstances the case presents would nonetheless compel dismissal on grounds of forum non conveniens, the end product would constitute a quintessential exercise in futility, and a vastly disproportional, inefficient and unjustifiable waste of the litigants' and the Court's time, energies and limited resources.  See Steel Co., 523 U.S. at 111 ("Whom does it help to have ... judges spend their time and energy puzzling over the correct answer to an intractable jurisdictional matter, when (assuming an easy answer on the substantive merits) the same party would win or lose regardless?") (Breyer, J., concurring in part).

A process that mandates what may be an essentially foregone conclusion, or an academic exercise calculated to impose unnecessary costs on the parties and the judicial system, is fundamentally at odds with the express efficiency and fairness purposes that anchor the principle of forum non conveniens.  Putting the parties through unjustifiable costs

and delays certainly is not in the interest of justice. Nor does it serve judicial efficiency to compel the courts to undertake superfluous analysis, with attendant pretrial delays.  In fact, under standard forum non conveniens analysis the superimposition of such extensive initial burdens in the home forum may be a factor that necessarily would weigh against retention of jurisdiction in the balancing of the Gilbert public and private interest factors.

Accordingly, the Court concludes that it is appropriate to put aside these difficult jurisdictional issues and proceed to consider instead whether this district is the most convenient forum for the parties to litigate the instant case.

### III.  <u>DISCUSSION</u>

Courts employ a two-part test to analyze an invocation of the forum non conveniens doctrine.  Initially, the court determines whether there exists an available and adequate alternative forum where the dispute could be adjudicated.  <u>See</u> <u>Gilbert</u>, 330 U.S. at 506-07; <u>Piper Aircraft Co. v. Reyno</u>, 454 U.S. 235, 254 n.22 (1981).  This inquiry consists of two parts: availability and adequacy.  Ordinarily, the availability requirement is met if the defendant is amenable to process in the alternative forum.  <u>See</u> <u>Gilbert</u>, 330 U.S. at 507 (noting that the doctrine "presupposes at least two forums in which the defendant is amenable to process"); <u>see</u> <u>also</u>

-34-

<u>Piper Aircraft</u>, 454 U.S. at 254 n.22.   The adequacy test
addresses the sufficiency of the alternative forum as a source
of remedies for the wrongs the plaintiff claims.   <u>See</u> <u>Piper</u>
<u>Aircraft</u>, 454 U.S. at 254 (noting that dismissal may not be in
the interest of justice "if the remedy provided by the
alternative forum is so clearly inadequate or unsatisfactory
that it is no remedy at all").

    If the preceding standards are met, the court assesses
the appropriateness of litigating the action in the
plaintiff's choice of forum, as opposed to the alternative
venue, by balancing the private interests of the litigants and
the public interest concerns of the court in accordance with
the factors articulated by the Supreme Court in <u>Gilbert</u>.   <u>See</u>
<u>Gilbert</u>, 330 U.S. at 508-09; <u>Monegasque</u>, 311 F.3d at 500;
<u>VictoriaTea.com, Inc. v. Cott Beverages</u>, 239 F. Supp. 2d 377,
381 (S.D.N.Y. 2003); <u>Moscovits v. Magyar Cukor Rt.</u>, No. 00
Civ. 0031, 2001 WL 767004, at *2 (S.D.N.Y. July 9, 2001),
<u>aff'd</u>, 34 Fed. Appx. 24 (2d Cir. 2002).   The inquiry probes
whether in the interest of justice and all other relevant
concerns the action would best be brought in another venue.
A threshold question in this regard is the degree of deference
that should be accorded to the plaintiff's choice of forum.
<u>See</u> <u>Piper Aircraft</u>, 454 U.S. at 255; <u>DiRienzo v. Philip Servs.</u>
<u>Corp.</u>, 294 F.3d 21, 28 (2d Cir. 2002); <u>Iragorri v. United</u>

-35-

<u>Techs.</u>, 274 F.3d 65, 70-71 (2d Cir. 2001).

A.   <u>DEFERENCE TO PLAINTIFF'S CHOICE OF FORUM</u>

Generally, there is a strong presumption in favor of the plaintiff's choice of forum.  <u>See</u> <u>Piper Aircraft</u>, 454 U.S. at 250; <u>DiRienzo</u>, 294 F.3d at 28; <u>Iragorri</u>, 274 F.3d at 70-71. In consequence, defendants have the burden of overcoming this presumption by establishing that the balancing of the <u>Gilbert</u> private and public interest factors "tilt strongly in favor" of the alternative forum.  <u>Wiwa v. Royal Dutch Petroleum Co.</u>, 226 F.3d 88, 100 (2d Cir. 2000); <u>see also</u> <u>Piper Aircraft</u>, 454 U.S. at 255-56; <u>Gilbert</u>, 330 U.S. at 508 (instructing that "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed"); <u>Iragorri</u>, 274 F.3d at 71-72.  Deference to the plaintiff's forum becomes a stronger consideration where the plaintiff is an American citizen, especially in cases in which the underlying claims arose under United States law or seek to enforce or promote significant American policy interests.  <u>See</u> <u>Piper Aircraft</u>, 454 U.S. at 256 (emphasizing that this rule is not intended to disadvantage foreign plaintiffs but rather reflects a realistic prediction of the ultimate convenience of the forum); <u>DiRienzo</u>, 294 F.3d at 31.

However, where the circumstances indicate that the parties and events bear no bona fide connection to the United

States, or that in relation to the core operative facts in dispute they at best may have only marginal links to the plaintiff's choice of forum, that choice of venue is not entitled to special deference, in particular where the claimants are all foreign residents. See Piper Aircraft, 454 U.S. at 256; Iragorri, 274 F.3d at 72; VictoriaTea.com, Inc., 239 F. Supp. 2d at 381. Weighed in this analysis is consideration of whether forum-shopping reasons may have served as a motivation in the plaintiff's chosen venue. See Iragorri, 274 F.3d at 72 ("[T]he more it appears that the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons . . . the less deference the plaintiff's choice commands and, consequently, the easier it becomes for the defendant to succeed on a forum non conveniens motion by showing that convenience would be better served by litigating in another country's courts.").

Here, Plaintiffs are all Turkish citizens. Their former employer, CCI, is a Turkish company with its principal place of business in Istanbul. Other than through Coca Cola's 40 percent joint venture interest in CCI and Defendants' Bottler's Agreement, Plaintiffs plead no other contact by CCI with the United States. The underlying injuries Plaintiffs assert stem from their alleged assaults and arrests by the Turkish police arising from their labor dispute with Trakya

and CCI in Istanbul.   These facts give rise to a strong inference that forum-shopping considerations served as a substantial motivation in Plaintiffs' venue choice in this District.   See Gilbert, 330 U.S. at 507 ("A plaintiff sometimes is under temptation to resort to a strategy of forcing the trial at a most inconvenient place for an adversary, even at some inconvenience to himself.").

Nor are these concerns mitigated by Plaintiffs' assertion of claims under international law.   See Aguinda v. Texaco, Inc., 142 F. Supp. 2d 534, 553 (S.D.N.Y. 2001), aff'd, 303 F.3d 470 (2d Cir. 2002) ("The United States ... has no special public interest, under the [ATS] or otherwise, in providing a forum for plaintiffs pursuing an international law action against a United States entity that plaintiffs can adequately pursue in the place where the violation actually occurred."). For these reasons the Court concludes that Plaintiffs' choice of forum is not entitled to deference.

To be sure, as Plaintiffs point out, in enacting the ATS and the TVPA Congress expressed "a policy favoring receptivity by our courts" to suits alleging violations of the law of nations.   Wiwa, 226 F.3d at 105.   At the same time, however, the Second Circuit has recognized that the TVPA has not "nullified, or even significantly diminished, the doctrine of forum non conveniens."   Id. at 106.   Accordingly, as the Wiwa

-38-

court counseled, even in cases invoking the ATS and TVPA, the controlling inquiry remains whether the defendant "has fully met the burden of showing that the Gilbert factors 'tilt[] strongly in favor of trial in the foreign forum.'" Id. (quoting R. Maganlal & Co. v. M.G. Chem. Co., 942 F.2d 164, 167 (2d Cir. 1991)). Moreover, as the legislative history of the TVPA suggests, Congress itself expressed concern and made provision in the statute to ensure that United States courts "will not intrude into cases more appropriately handled by courts where the alleged torture or killing occurred. It will also avoid exposing U.S. courts to unnecessary burdens, and can be expected to encourage the development of meaningful remedies in other countries." H.R. Rep. No. 102-367, at 5 (1991), reprinted in 1992 U.S.C.C.A.N. 84, 88.

For these reasons, Plaintiffs' reliance on Wiwa is misplaced. In Wiwa, some of the plaintiffs were lawful United States residents and, as the Circuit Court's formulation of the issues makes clear, one of the central considerations was the district court's failure to give adequate weight to the resident plaintiffs' choice of forum. See 226 F.3d at 101. In addition, the alternative forum the district court identified was not the one in which the events occurred and which thus had the most significant contacts with the action. Rather, it was a jurisdiction associated primarily with

-39-

defendants' residence, and one that in significant respects posed inconveniences for the United States plaintiffs more severe than those they would encounter in litigating in their chosen forum.

B.  ADEQUATE ALTERNATIVE FORUM

As stated above, the adequate alternative forum requirement of the forum non conveniens doctrine is ordinarily satisfied if (1) the other forum is available because the defendant is amenable to service of process there, and (2) the forum permits litigation of the subject matter of the dispute and offers remedies for the wrongs the plaintiff alleges, even if the causes of action and relief provided there are not identical in every respect to the claims the plaintiff demands or redress he seeks in his chosen forum.  See Monegasque, 311 F.3d at 499 (citing Piper Aircraft, 454 U.S. at 254 n.22); Capital Currency Exch. v. National Westminster Bank PLC, 155 F.3d 603, 610 (2d Cir. 1998); DiRienzo v. Philip Servs. Corp., 232 F.3d 49, 57 (2d Cir. 2000), vacated in part on other grounds, 294 F.3d 21 (2d Cir. 2002)).  The proffered alternative forum may be inadequate, for example, where the plaintiff demonstrates that he would encounter exceptional legal, political or practical barriers in litigating in the other forum, such as the prospect of execution or a justice system closed to him as a member of an outcast class.  See,

-40-

e.g., Rasoulzadeh v. Associated Press, 574 F. Supp. 854 (S.D.N.Y. 1983), aff'd, 767 F.2d 908 (2d Cir. 1985); see also Menendez Rodriguez v. Pan Am. Life Ins. Co., 311 F.2d 429 (5th Cir. 1972), vacated on other grounds, 376 U.S. 779 (1964).

The Court notes that CCI, as a Turkish corporation headquartered in Istanbul, is amenable to process there, and that CCI has expressed agreement not to challenge the appropriateness of Turkey as a forum for litigation of this action. (See Declaration of Işil Baytok in Support of CCI Mot., dated March 24, 2006 ("Baytok Dec."), ¶ 64.) Similarly, Coca Cola and CCEC have represented that they are prepared to consent to personal jurisdiction in Turkey for the purposes of adjudicating this dispute in that country. (See Defs. Mem at 13.); see also Aguinda v. Texaco, Inc., 303 F.3d 470, 476-77 (2d Cir. 2002) (alternative forum requirement generally satisfied by defendant's consent to the exercise of jurisdiction of the foreign action); Travelers Indem. Co. v. S/S Alca, 713 F. Supp. 129, 130-31 (S.D.N.Y. 1989).

With regard to the second requirement, "[a]n alternative forum is ordinarily adequate if the defendants are amenable to service of process there and the forum permits litigation of the subject matter of the dispute." Monegasque, 311 F.3d at 499. Conversely, a forum may be deemed inadequate if it is "characterized by a complete absence of due process or an

inability of the forum to provide substantial justice to the parties." Id.; see also Moscovits, 2001 WL 767004, at *3.

Addressing the preceding standard, Defendants rely upon declarations of several experts on Turkish law who advise on issues of tort and administrative law, labor law and criminal law in Turkey relevant to this dispute.  (See Declaration of Ergan Özsunay, Ph.D. in Support of Defs. Mot., dated March 24, 2006 ("Özsunay Dec.")); Declaration of Nurşen Caniklioğlu, Ph.D in Support of Defs. Mot., dated March 24, 2006; Declaration of Kőksal Bayraktar, Ph.D. in Support of Defs. Mot., dated March 24, 2006.)  In these documents the experts attest that Turkish law contains various substantive provisions and procedures under which Plaintiffs can pursue claims and obtain remedies for the forms of misconduct Plaintiffs allege against Defendants, and can be awarded both monetary and injunctive relief. (See, e.g., Özsunay Dec. ¶¶ 36-41.)

In fact, Plaintiffs' assertions that Turkey does not provide an adequate forum for the relief they seek is somewhat contradicted by their own acts in filing complaints against the Turkish police seeking redress for some of the same injuries they assert here. (See Baytok Dec. ¶¶ 58, 59, 63.)

Plaintiffs did not submit any expert opinion to counter the evidence Defendants submitted to satisfy their burden of

-42-

production in this regard. Instead, they insist that they
should be afforded an opportunity to depose Defendants'
experts, to that extent essentially resting on their own
sweeping, conclusory statements as well on human rights
country reports prepared by certain government agencies and
private groups about the deficiency of Turkish justice.  The
Court rejects this approach.  Plaintiffs had adequate
opportunity to satisfy their own burden of production directly
in response to Defendants' documentary evidence by submitting
their own expert opinion raising any factual dispute as to the
content of Turkish law and challenging the substance of the
views expressed by Defendants' experts, their professional
credentials, credibility or good faith.  Absent such a showing
by sufficiently reliable evidence, the Court may properly
accord due consideration to the views expressed by Defendants'
professional experts with regard to the adequacy of Turkey as
an adequate forum.  See generally Abdullahi v. Pfizer, Inc.,
No. 01 Civ. 8118, 2005 WL 1870811 at *15-*17 (S.D.N.Y. Aug. 9,
2005).

        To the extent that Plaintiffs rely on citations to State
Department reports and statements from various non-
governmental organizations to support these conclusory
attacks, the Court rejects these sources as insufficient to
demonstrate the inadequacy of Turkey as an alternative forum.

See id. (collecting cases rejecting State Department reports, newspaper articles, and NGO reports as evidence of inadequacy of alternate forum).

Moreover, the Court notes that in the context of forum non conveniens inquiries, other courts have rejected the contention that Turkey is an inadequate forum for adjudication of private disputes sufficiently similar to those at issue here. See, e.g., Travelers Indem. Co., 713 F. Supp. at 131-32 (finding Turkey to be an adequate forum in a negligence and breach of contract dispute because Turkish courts "are best equipped to resolve the dispute" and New York had little interest in the controversy); see also Mercier v. Sheraton Int'l, Inc., 981 F.2d 1345, 1351 (1st Cir. 1992) (finding Turkey an adequate forum in a complex dispute involving issues of tort and criminal law, corporate and partnership interests and government permits to transact business in Turkey, and noting that "it is not unfair that a plaintiff's conclusory claims of social injustice in the foreign nation where she deliberately chose to live, work, and transact the business out of which the litigation arises should be accorded less than controlling weight in the selection of a judicial forum for the related litigation"). Finally, as noted above, Plaintiffs have resorted to legal proceedings before courts in Turkey to assert claims for injuries arising from the same the

events of the labor dispute at issue here.  (See Baytok Dec. ¶¶ 57-59.)

Plaintiffs nonetheless denounce Turkish justice as  not providing access "to an independent or functioning legal system" and declare that Turkey is "beset with a corrupt judiciary and impunity for officials accused of torture." (Compl. ¶ 8.)  The Second Circuit repeatedly has cautioned against judges giving serious consideration to such conclusory attacks, underscoring the concerns that censures of this kind raise if endorsed by our courts, especially when based on bare aspersions and expansive generalizations.  See Monegasque, 311 F.3d at 499 ("We have been reluctant to find foreign courts 'corrupt' or 'biased.'") (citing Blanco v. Banco Indus. de Venezuela, S.A., 977 F.2d 974, 981-82 (2d Cir. 1993)); Jhirad v. Ferrandina, 536 F.2d 478, 484-85 (2d Cir. 1976) ("It is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation."); see also Moscovits, 2001 WL 767004, at *4 (cautioning about the risks of such judicial condemnations to international comity, and to the potential of imposing on our judicial system the burden of adjudicating essentially foreign disputes with only nominal connections with the United States).

Plaintiffs next argue that to the extent this case is

-45-

based on unlawful conduct occurring Turkey, their underlying claims are grounded on two federal statutes reflecting United States policy to provide a forum to adjudicate actions involving charges of torture and related violations of norms of international law.  The Court has already addressed this point above in determining that in this case Plaintiffs' choice of forum is not entitled to deference.

Nor does Plaintiffs' contention that Turkish law may not contain provisions allowing causes of actions or remedies precisely equivalent to those Plaintiffs assert in the instant action constitute a bar to a finding that an adequate forum exists.  See PT United Can Co. v. Crown Cork & Seal Co., 138 F.3d 65, 74 (2d Cir. 1998) (noting that the non-existence of a RICO statute in the proposed alternate venue does not bar the use of that forum) (citing Transunion Corp. v. Pepsi Co. Inc., 811 F.2d 127 (2d Cir. 1987)); Moscovits, 2001 WL 767004, at *3 ("While Moscovits contends that Hungary does not provide specific causes of action for conversion and fraud ... the adequacy of an alternate forum does not depend upon the availability of causes of action identical tho those in the United States.") (citing Capital Currency Exch., 155 F.3d at 610).

Accordingly, the Court finds that Turkey would provide an adequate forum for the adjudication of this litigation.

C.   THE GILBERT FACTORS

Under the forum non conveniens doctrine, upon finding that no special deference to the plaintiff's choice of forum is warranted, and that an adequate alternative forum does exist, the Court must then determine, by balancing the private interests of the litigants with the public interest concerns of the Court, whether adjudication of the action in Plaintiff's chosen forum would be inconvenient and unjust. See Gilbert, 330 U.S. at 508-09.

1.   The Private Interest Factors

The private interests of the litigants the Court must consider under the Gilbert analysis are: (a) the ease of access to evidence; (b) the availability of compulsory process; (c) the cost for cooperative witnesses to attend trial;  (d) the enforceability of a judgment; and (e) all other practical matters that might shorten any trial or make it less expensive.  See id. at 508.

In the instant case, these factors all weigh strongly in favor of litigating the parties' dispute in Turkey.  The wrongful conduct that Plaintiffs allege caused their injuries is fundamentally connected with the attack on them and arrest by Turkish police in Istanbul on July 20, 2005.  Not only these events but the entire labor relationship and course of dealings between the Union-member Plaintiffs and CCI and

-47-

Trakya, during a period of several years that led up to the
July 20, 2005 incident, all occurred in Turkey.   To that
extent, the entire factual record of the events most central
to the action is located in Turkey.  Access to the dozens of
party and non-party witnesses whose testimony would be
necessary -- including police officers, medical personnel,
representatives of CCI and Trakya and potentially Turkish
government officials -- and any related documentary evidence,
is entirely in Turkey, and thus beyond the reach of this
Court's power to compel production.  All of that evidence,
both documentary and of live witnesses, would have to be
translated for any effective use in proceedings in this Court.
The costs, inconvenience and impracticalities of subjecting
those witnesses to participating at trial in this District,
even if voluntary, would be substantially higher relative to
comparable costs and other burdens they would incur in Turkey.
Even if some testimony of non-parties could be obtained and
preserved by deposition, to do so would implicate proceedings
under the Hague Convention on the Taking of Evidence Abroad in
Civil or Commercial Matters, a prospect that entails
significant amounts of time even in ordinary cases, and far
more in complicated litigation such as this action.  In all
probability, these circumstance would cause not only financial
hardships, but significant delays in preparing the case for

-48-

trial before this Court, and ultimately in resolving the
merits of the dispute.

As against the overwhelming dominant contacts of this
action with the Turkey, Plaintiffs point out that Coca Cola
and CCEC are American corporations with vast resources and
operations all over the world; that it was from the United
States that Defendants allegedly directed the events that
resulted in the attack on Plaintiffs by Turkish police, and
thus some of the alleged wrongful acts occurred in the United
States; and that the evidence pertaining to this misconduct is
located here.  The Court is unpersuaded.  These arguments
entirely ignore the inextricable connections of this action to
the triggering events associated with the aspects of this
action that Plaintiffs themselves characterize as the "local
labor dispute" (Compl. ¶ 90), as well as with the overwhelming
and fundamental contacts of this litigation with Turkey.
Whatever conduct Plaintiffs ascribe to Coca Cola and CCEC that
allegedly occurred in the United States, and the witnesses and
documents associated with relevant events in this country,
pale by comparison of the magnitude of the factual and legal
links of the case to Turkey.

2.  The Public Interest Factors

The Gilbert public interest factors to be weighed by the
Court include: (a) administrative difficulties relating to

-49-

court congestion; (b) imposing jury duty on citizens of the forum; (c) having local disputes settled locally; and (d) avoiding problems associated with the application of foreign law. See Gilbert, 330 U.S. at 508-09; Monegasque, 311 F.3d at 500. These considerations also weigh heavily in favor of dismissal of this action.

First, there is no indication that courts in the Turkey are any more congested than the busy courts in this District. Second, Plaintiffs are all residents of Turkey, as is CCI and the individuals who own the majority (60 percent) interest in the CCI joint venture. To this extent, the core events, operative facts and associated corporate interests in dispute are local to Turkey. Accordingly, there is a significant interest in having localized matters decided in the local forum in accordance with domestic law governing the case. See Gilbert, 330 U.S. at 509 (noting the "local interest in having localized controversies decided at home"); Monegasque, 311 F.3d at 500-01 (noting that "there is no reason why localized matters should not be determined by the courts of the locale bearing the most significant contacts with them"). Moreover, it is more probable that any wrongful acts that may have been committed by Defendants in the United States produced effects in Turkey far greater than any effects felt in this country from such actions, that would override Turkey's interest in

exercising jurisdiction to adjudicate all aspects of this controversy.  Not the least reason supporting this conclusion is that it was uniquely in Turkey that the injuries Plaintiffs, all residents of Turkey, attribute to Defendants befell upon them -- at the hands of Turkish police allegedly acting under immediate orders of the Turkish employer of the Union-member Plaintiffs.

Plaintiffs assert various causes of action essentially dependent on the Union-members' employment relationship with CCI and Trakya and corresponding rights, duties and remedies arising under Turkish law governing labor relations and disputes between employers and their employees.  For example, these claims fundamentally implicate rules regarding collective bargaining agreements of the forum state where the legal relationships were established and where the underlying events that gave rise to the rights of action occurred.  In addition, integrally underlying their claims are their allegations of violent misconduct by Turkish police that Plaintiffs assert constituted offenses under international human rights law.

Here, Plaintiffs allege that they were unlawfully fired by Trakya acting as an agent of or under the control of Defendants, and that it was that illegal action that prompted the peaceful demonstration at which they were injured by

Turkish police.  To the extent relevant to Plaintiffs' claims here, any legal relationship between Plaintiffs and CCI, and any employment rights the Union workers had under the circumstances would be defined by Turkish law.  Similarly, Turkish law would govern the duties, immunities and liabilities of the local police, and the degree to which the connection between CCI and the police would give rise to Plaintiffs' claims to against Defendants on a theory of vicarious liability or aiding and abetting a tort. See Kalb, Voorhis & Co. v. American Fin. Corp., 8 F.3d 130, 132 (2d Cir. 1993) (noting that for purposes of conflicts of laws analyses, New York "has adopted an 'interest analysis,' which requires that . . . 'the law of the jurisdiction having the greatest interest in the litigation . . . be applied'") (quoting Intercontinental Planning, Ltd. v. Daystrom, Inc., 248 N.E.2d 576, 582 (N.Y. 1969)); AroChem Int'l v. Buirkle, 968 F.2d 266, 269-70 (2d Cir. 1992).  Consequently, because the bulk of Plaintiffs' common law claims would require application of principles of Turkish law, Turkey is the forum with the most significant legal contacts with and the greatest jurisdictional interest in the adjudication of the controversy before the Court.  As the declarations of Defendants' experts indicate, Turkish law contains provisions recognizing liability on these grounds.  (See, e.g., Özsunay Dec. ¶¶ 38,

39, 44, 45.)

Also, for these reasons, an action should be tried in a forum familiar with the law governing the case.  See Gilbert, 330 U.S. at 508-09; see also Monegasque de Reassurances S.A.M. v. NAK Naftogaz of Ukraine, 158 F. Supp. 2d 377, 387 (S.D.N.Y. 2001), aff'd, 311 F.3d 488 (2d Cir. 2002) ("Although reluctance to apply foreign law is not dispositive, courts have a legitimate interest in avoiding the difficulty with questions of conflicts of law and the application of foreign law."); see also Moscovits, 2001 WL 767004, at *7.  Indeed, as already described above, Plaintiffs have already been involved in legal actions they filed in Turkey concerning some of the conduct Plaintiffs cite as grounds for their claims in the instant case.  Thus, to some degree, the respective rights and duties of the parties arising from the underlying events may be addressed and construed in those proceedings pursuant to Turkish law. By contrast, the Court finds no compelling reason why the law and judicial resources of this forum should be applied to resolve this dispute, nor any overriding American policy interest that would be promoted or enforced by doing so.  See Piper Aircraft, 454 U.S. at 256.

To the circumstances compellingly tilting the public interest factors towards Turkey, Plaintiffs respond by pointing to a United States' interest in adjudicating alleged

violations of international law under the ATS and the TVPA, as well as charges of corporate misconduct occurring in the United States and involving large American businesses. For the reasons already articulated above, the Court is not persuaded that these considerations weigh in favor of maintaining this action in this forum. Whether or not the United States has some interest in the adjudication of this action in this Court is not the controlling question. Rather, the real issue is whether on balance the United States' interests identified by Plaintiffs, all Turkish residents, outweigh those of Turkey in resolving charges of violations of local and international law by Turkish police, who allegedly committed these offenses in Turkey acting in concert there with Turkish business entities, which in turn acted at the direction of major non-Turkish corporations doing substantial business in Turkey. This Court finds that the scale tilts strongly in favor of Turkey in this case.

The Court concludes that on balance the links of this action with this District are minimal compared with the contacts of the controversy with Turkey, and that the central dispute concerns Turkey more than the United States. Thus, the balance of the <u>Gilbert</u> private and public interest factors weigh heavily in favor of dismissal of this action. Accordingly, the Court grants Defendants' motions. The

dismissal, however, is subject to Defendants' expressing to the Court their consent to certain conditions: that in the event Plaintiffs commence litigation in Turkey arising out of the circumstances and general claims asserted in this case, Defendants agree to accept service of process and to the exercise of personal jurisdiction by the relevant tribunal in Turkey; that Defendants not assert any defenses based on statutes of limitations that would not available to them were this litigation prosecuted in this Court; and that Defendants would satisfy any final judgment rendered by a Turkish court in connection with such litigation. See Aguinda, 303 F.3d at 480 (affirming forum non dismissal subject to modification that the judgment be conditioned on defendant's agreement to waive statutes of limitations defenses); Blanco, 997 F.2d at 984 ("[F]orum non conveniens dismissals are often appropriately conditioned to protect the party opposing dismissal.") (collecting cases).[2]

---

[2]  The Third Circuit and the D.C. Circuit have suggested that any dismissal on forum non conveniens grounds without a prior determination of subject matter jurisdiction should not be subject to conditions, on the theory that "exaction of such a condition would appear inescapably to constitute an exercise of jurisdiction." Papandreou, 139 F.3d at 256 n.6; see Malaysia, 436 F.3d at 363. However, conditional forum non conveniens dismissals are standard in the Second Circuit. Such conditions may, as is the case here, be necessary to the forum non conveniens analysis itself, for such conditions create the adequate alternative forum. The Second Circuit has found a forum non conveniens dismissal to be erroneous in the absence of a condition requiring the defendant to submit to jurisdiction in the alternative forum, since "[t]he forum non conveniens doctrine allows dismissal only where the court determines that an alternative forum is available, because application of the doctrine presupposes at least two forums in which the defendant is amenable to process." Jota v. Texaco, Inc., 157 F.3d 153, 158-59 (2d Cir. 1998) (internal quotation and citation

Because this ruling adequately disposes of the action on forum non conveniens grounds, the Court does not address the other theories Defendants' motions argue.

**IV.  <u>ORDER</u>**

For the reasons described above, it is hereby

**ORDERED** that the motions (Docket Nos. 19 and 22) of defendants The Coca-Cola Company ("Coca Cola") and Coca-Cola Export Corporation ("CCEC") and of defendant Coca-Cola Içecek A.S. ("CCI"), (Coca Cola, CCEC and CCI collectively, "Defendants"), to dismiss this action on the grounds of forum non conveniens are GRANTED, provided that within ten (10) days of the date of this Order, Defendants submit to the Court a statement expressing their consent that in the event plaintiffs in this action commence litigation in Turkey arising out of the circumstances and general claims asserted in this case, Defendants would accept service of process and the relevant tribunal's exercise of personal jurisdiction over them, not assert any defenses based on statutes of limitations that would not be available to Defendants were the litigation of the action to proceed in this Court, and satisfy any final judgment rendered by a Turkish court in connection with such

omitted).  Moreover, where such condition consists of consenting to personal jurisdiction or waiving of statute of limitations defenses, the defendant merely "is asked to cede a personal defense that is waivable at its will." <u>Gross v. British Broadcasting Corp.</u>, 386 F.3d 224, 234 (2d Cir. 2004).

litigation of claims arising out of the events described in the complaint in this action.

The Clerk of Court is directed to close this case.

**SO ORDERED.**

Dated:     New York, New York
           2 November 2006


VICTOR MARRERO
U.S.D.J.